Brenda EVANS et al., Plaintiffs,

v.

Madeline BUCHANAN et al.,
Defendants.

Civ. A. Nos. 1816 to 1822.

United States District Court,
D. Delaware.

Jan. 9, 1978.

Joseph A. Rosenthal and Irving Morris, of Morris & Rosenthal, Wilmington, Del., and Louis L. Redding, Wilmington, Del., for individual plaintiffs.

Richard Allen Paul, of Paul, Lukoff & Hurley, Wilmington, Del., of counsel; Louis R. Lucas, Ratner, Sugarmon, Lucas, Salky & Henderson, Memphis, Tenn., Paul R. Dimond, of O'Brien, Moran & Dimond, Ann Arbor, Mich., William L. Taylor, Center for National Policy Review, Washington, D.C., for intervening plaintiffs.

Aida Waserstein, Wilmington, Del., for intervening Hispanic plaintiffs.

Richard R. Wier, Jr., Atty. Gen., Regina M. Small, Deputy Atty. Gen., State of Delaware, William Prickett and Mason E. Turner, of Prickett, Ward, Burt & Sanders, Wilmington, Del., Philip B. Kurland, Chicago, Ill., for defendant State Board of Education.

Edward W. Cooch, Jr., of Cooch & Taylor, Wilmington, Del., for Marshallton-McKean School Dist.

Samuel R. Russell, of Biggs & Battaglia, Wilmington, Del., for Alexis I. duPont School Dist.

William Poole, of Potter, Anderson & Corroon, Wilmington, Del., for Alfred I. duPont School Dist.

James T. McKinstry, of Richards, Layton & Finger, Wilmington, Del., for Claymont and Stanton School Dists.

John P. Sinclair, of Potter, Anderson & Corroon, Wilmington, Del., for Newark School Dist.

Jerome O. Herlihy, of Herlihy & Herlihy, Wilmington, Del., for Conrad Area School Dist.

Howard M. Handelman and Jeffrey M. Weiner, of Bayard, Brill & Handelman, Wilmington, Del., for New Castle County Vocational-Technical School Dist.

James M. Tunnell, Jr., and Richard Allen, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for Mount Pleasant School Dist.

David Anderson, of Potter, Anderson & Corroon, Wilmington, Del., for New Castle-Gunning Bedford School Dist.

Thomas S. Lodge, of Connolly, Bove & Lodge, Wilmington, Del., for DeLaWarr School Dist.

Sheldon N. Sandler, of Bader, Dorsey & Kreshtool, Wilmington, Del., amicus curiae, Delaware State Education Assn.

Clifford B. Hearn, of Balick & Hearn, P.A., Wilmington, Del., amicus curiae, Wilmington Federation of Teachers AFT AFL–CIO.

Henry N. Herndon and Edward M. McNally, of Morris, James, Hitchens & Williams, Wilmington, Del., for New Castle County Planning Board of Education, a non-aligned party.

Leonard L. Williams and George E. Evans, Wilmington, Del., for Wendell Howell, member of New Castle County Planning Board of Education.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

This opinion treats the few and relatively narrow remedial issues that remain for decision in this twenty year litigation, the more recent phase of which was initiated in 1971.[1] Those issues are: (1) What inter-district pupil assignment concept should be employed to extirpate the *de jure* segregation and dual school system in Northern New Castle County, the constitutional violation and scope of remedy having been determined and all appeals on those issues exhausted; (2) What ancillary relief is required to overcome the "continuing condi-

tions of inequality produced by the inherently unequal dual school system"[2] and vestige effects of *de jure* segregation never eradicated in Northern New Castle County; (3) What specific relief is required in the area of governance in light of past and continuing defaults by the State Legislature; (4) Whether this Court should retain continuing jurisdiction, and other future litigation matters. A summary of the procedural and factual background is necessary to place the matter presently before the Court in proper context.[3]

## I. *PUPIL REASSIGNMENT*

### A. *Background*

The genesis of this case can be attributed to a matter styled *Gebhart v. Belton*, 33 Del. 144, 91 A.2d 137 (1952). In that consolidated case, the Delaware Supreme Court ordered two districts[4] to immediately admit black children plaintiffs into *de jure* all white schools. Upon review, the United States Supreme Court granted certiorari, combining *Gebhart* with other cases to formulate the historic *Brown v. Board of Education* saga.[5] The Supreme Court affirmed but remanded *Gebhart*, mandating "a prompt and reasonable start toward . . . a transition to a racially nondiscriminatory school system."[6]

In 1957, plaintiffs filed this action charging, *inter alia*, a failure to follow the mandate of *Brown*. Efforts to achieve the goal of *Brown* between 1958 and 1971 are chron-

1. Published opinions or rulings on the current phase of this litigation in chronological order are: *Evans v. Buchanan*, 379 F.Supp. 1218 (D.Del.1974); *Evans v. Buchanan*, 393 F.Supp. 428 (D.Del.1975); *Buchanan v. Evans*, 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975); *Evans v. Buchanan*, 416 F.Supp. 328 (D.Del.1976); *Evans v. Buchanan*, 424 F.Supp. 875 (D.Del. 1976); *Evans v. Buchanan*, 555 F.2d 373 (3d Cir.), *cert. denied*, 434 U.S. 880, 98 S.Ct. 235, 54 L.Ed.2d 160 (1977); *Evans v. Buchanan*, 435 F.Supp. 832 (D.Del.1977).

2. *Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 2762, 53 L.Ed.2d 745 (1977) ("*Milliken II*").

3. A more completely detailed summary of recent developments can be found in Doc. 668, App. A.

4. The two, Claymont and Alexis I. duPont ("Alexis I."), are intervening suburban district defendants in the instant litigation. Alexis I. absorbed Hockessin, the defendant district in *Gebhart v. Belton, supra*.

5. *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) ("*Brown I*"); 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) ("*Brown II*").

6. 349 U.S. at 300–01, 75 S.Ct. at 756.

icled elsewhere [7] and will not be repeated here.

In 1971, the present phase of this litigation was initiated. Subsequently the Wilmington Board of Education intervened as a party plaintiff with the State Board of Education and State Superintendent of Public Instruction remaining aligned as party defendants. In 1974, a three-judge court [8] made detailed factual findings and unanimously held the State Board of Education had failed to eliminate the *de jure* segregated school system which had previously existed in Northern New Castle County.[9] Concerned that suburban districts that might be affected by a final order lacked an adequate opportunity to be heard, the three-judge court invited them to intervene and present evidence on the issues raised by the amended complaint.[10] Although virtually all suburban boards accepted the invitation,[11] the district boards presented no evidence, electing to adopt the State Board pleadings and stand on the existing record. Following briefing and oral argument, the three-judge court filed a second opinion [12] directing the submission of remedial schemes, including inter-district desegregation proposals. As earlier summarized by this Court, a majority of the three-judge court held that an:

"inter-district remedy would be appropriate, based on its findings that:

"1) there had been a failure to alter the historic pattern of inter-district segregation in Northern New Castle County;

"2) governmental authorities at the state and local levels were responsible to a significant degree for increasing the [racial] disparity in residential and school populations between Wilmington and the suburbs;

"3) the City of Wilmington had been unconstitutionally excluded from other school districts by the State Board of Education, pursuant to a withholding of reorganization powers under the Delaware Educational Advancement Act of 1968."

424 F.Supp. at 877. Defendants appealed to the Supreme Court, which summarily affirmed the three-judge court order.[13]

Following the Supreme Court summary affirmance, the three-judge court endeavored to develop a remedy to redress the inter-district constitutional violation. Three weeks of evidentiary hearings were held to evaluate the approximately nineteen proposals that were submitted.[14] The schemes under consideration divided analytically into three groups: voluntary transfer, reorganization into different districts with a portion of the black minority population to be included within each district, and "mandatory assignment plans providing for the transfer and transportation of students among the existing districts." [15] In May, 1976, after thorough consideration and articulation of additional findings of fact, the three-judge court rejected all proposals submitted.[16] Recognizing that *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) ("*Milliken I*") "makes plain that the remedy to be ordered must be commensurate with the scope of the viola-

---

7. *Evans v. Buchanan*, 379 F.Supp. 1218, 1220–21 (D.Del.1974).

8. A three-judge court was impaneled pursuant to 28 U.S.C. § 2281 (repealed 1976) because plaintiffs had charged portions of the Delaware Educational Advancement Act of 1968, 14 *Del.C.* §§ 1001 *et seq.*, were unconstitutional.

9. 379 F.Supp. 1218 (D.Del.1977).

10. 393 F.Supp. at 430. The court relied on *Milliken v. Bradley*, 418 U.S. 717, 754, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974). ("*Milliken I*").

11. The New Castle County Vocational Technical District, consisting of one high school, opt-

ed not to intervene because it accepts students from all of New Castle County.

12. 393 F.Supp. 428 (D.Del.1975).

13. 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975) (Rehnquist and Powell, JJ., and Burger, C. J., dissented).

14. 416 F.Supp. at 335.

15. *Id.* at 336–37.

16. *Id.* at 350.

tion which has been found," [17] the three-judge court perceived that its "duty is to order a remedy which will place the victims of the violation in substantially the position which they would have occupied had the violation not occurred." [18] The court also noted that "where the violation found resulted in the operation of a dual school system, the Court must order the 'greatest possible actual degree of desegregation,' consistent with the practicalities of the situation . . . ." [19] Based primarily upon these *Milliken I* principles, the three-judge court stressed that the nature and scope of the constitutional violation required an inter-district remedy. It then defined the geographic area to be included within the desegregation scheme and noted that reorganization of the affected school districts would be required.

In the course of formulating its primary remedial decree, the three-judge court went to virtually unprecedented lengths to minimize federal court intrusion. In pursuit of its policy of nonintrusion, the district court deferred to the State Legislature to cure the constitutional violation both with respect to the scheme of reorganization and to issues of governance, noting that "[s]uch decisions are far better left to legislators and the process of compromise than to the rigors of judicial determination." [20] In the event the Delaware Legislature defaulted, the three-judge court provided that the affected desegregation area should be one county wide system [21] governed on an interim basis by a five member board appointed by defendant State Board of Education and consisting of board members from the existing districts. [22] To promote an orderly transition to a unitary system, the three-judge court afforded the parties a fifteen month delay. Finally, the three-judge court allowed whatever constitutional pupil assignment plan was adopted by responsible State authorities to become effective in two stages with the first step, grades 7–11, [23] to be accomplished by September, 1977, and full compliance to be achieved with the commencement of the September, 1978 school year.

Certain defendants appealed the three-judge court order to the Supreme Court, with a protective appeal being lodged with the Third Circuit. On November 28, 1976, the Supreme Court dismissed the appeal for want of jurisdiction. [24] Thereafter, the protective appeal was pursued before the en banc [25] Court of Appeals. The Third Circuit divided four to three in upholding the three-judge remedy order, except for one particular not presently germane. In affirming the three-judge court on scope of remedy, the circuit court majority adopted, endorsed, and furthered the efforts of the lower court to minimize federal intrusion, stating:

"[T]he district court stressed that 'the State Legislature and the State Board of Education may take such steps as are not violative of constitutional rights to change the pattern set here,' 416 F.Supp. at 357, and ordered creation of an interim board to operate the schools 'for so long as the State takes no action.' *Id.* We specifically affirm this governance plan and emphasize that prompt compliance by

17. *Id.* at 339 (footnote omitted).

18. *Id.* at 341 (footnote omitted).

19. *Id.*

20. *Id.* at 352 (citing *Milliken I,* 418 U.S. at 744, 94 S.Ct. 3112).

21. The Appoquinimink District in the extreme southern portion of New Castle County was excluded from the desegregation area.

22. The three-judge court also permitted the Delaware General Assembly to alter the composition of the interim board. The Legislature thereafter swiftly increased the composition of the interim board to provide each affected district with representation on the board. Senate Bill No. 796, as amended by Senate Amendment No. 1 (June 25, 1976). *See* 424 F.Supp. at 878 n. 12.

23. For an explanation of the treatment of students who would enter twelfth grade during the first year of desegregation (rising seniors), *see* text *infra,* at 1012–1013.

24. 429 U.S. 973, 97 S.Ct. 476, 50 L.Ed.2d 579 (1976).

25. Chief Judge Seitz and Judge Gibbons did not participate in the en banc court.

the state may make action by the interim board unnecessary."

555 F.2d at 380–81. Regrettably, the State failed to act.[26]

On October 3, 1977, the Supreme Court declined to review the Third Circuit en banc determination by denying certiorari petitions filed by the State Board of Education and five suburban districts.[27]

In the hiatus between the Third Circuit affirmance of the three-judge court remedy order and the denial of certiorari by the Supreme Court, defendant State Board declined to endorse and bring before the Court any interim board pupil assignment proposal. Instead, the State Board, without benefit of implementing legislation, proffered a variant voluntary scheme known as "reverse volunteerism." Hearings concerning reverse volunteerism were conducted on July 19–25, 1977. Following the hearings and after consideration of an application for a stay of the three-judge court order, this Court on August 5, 1977 issued an Order and Opinion [28] rejecting the concept of reverse volunteerism [29] but granting a limited stay. The stay deferred implementation of the one district plan for grades 7 through 11 scheduled to commence in September 1977 pending disposition of the writ of certiorari to the Supreme Court. The stay decision also necessitated temporarily delaying transfer of authority to the New Board and abolition of the eleven school districts.

Although granting a limited stay, the Court ordered the State Board to appoint a five member new board as required by a May 19, 1977 order of this Court entered pursuant to the Third Circuit mandate. This new board was named the New Castle County Planning Board of Education ("NCCPBE" or "New Board"). Its primary responsibilities were to develop a complete desegregation scheme and to prepare and plan for the assumption of authority over the school system. The Court directed the NCCPBE to file its desegregation proposal on or before September 30, 1977. The NCCPBE timely filed its report, consisting of a majority report [30] addressing pupil assignment and other matters relating to the desegregation process and a minority report [31] containing only a pupil assignment proposal. The majority report (10–2) contemplates the reassignment of all students from the geographic area of the two predominantly black districts to the geographic area of the predominantly white districts for ten years and the reassignment of all students from the geographic area of the predominantly white districts to the geographic area of the predominantly black districts for two consecutive years. The minority report (Plan W) generally assigns children on a random basis and attempts to minimize the average number of years that students from the geographic areas of the two predominantly black districts are reassigned to the geographic area of the predominantly white districts.

Hearings on the 10–2 majority and Plan W minority reports commenced on October 18, 1977 and terminated on November 8, 1977.[32] At an early stage, the Court perceived weaknesses in each submission and within certain fixed parameters directed the New Board to examine the feasibility of

---

26. For a full account of what did and did not transpire, see *Evans v. Buchanan*, 435 F.Supp. 832 (D.Del.1977).

27. Claymont, Newark, New Castle-Gunning Bedford, and Marshallton-McKean, and Stanton.

28. 435 F.Supp. 832 (D.Del.1977).

29. Reverse volunteerism was rejected on both procedural and substantive grounds. For an explanation of the concept of reverse volunteerism and a more expansive discourse concerning its deficiencies, see text *infra*, at 1000–1001.

30. NCCPBE Exh. 1. Four members of the five person NCCPBE endorsed the majority report.

31. PX 15. The minority report was submitted by the Wilmington District representative of the NCCPBE.

32. Doc. 663 (Transcript of Hearings of 10/18/77–11/8/77). On November 8th, over objection of plaintiffs who desired an earlier implementation date, the Court ordered that full implementation must be accomplished by September 1978. Doc. 638.

other alternatives. The NCCPBE responded by activating a six member Pupil Assignment Committee. The individual membership of that Committee were relieved of their regular duties by their respective districts.[33] The Pupil Assignment Committee labored diligently,[34] completing its assigned task on November 21, 1977 and filing its special report with the New Board the following day.

The Pupil Assignment Committee report[35] declared that the alternatives examined were viable, given that certain noted concerns could be resolved.[36] The report detailed three alternative concepts and outlined variations to the illustrations. These concepts (9–3) contain the common standard of reassignment of all students from the geographic area of the predominantly black districts to the geographic area of the predominantly white districts for nine years and reassignment of all students from the geographic area of the predominantly white districts to the geographic area of the predominantly black districts for three consecutive years.

### B. *Roles of the Court and the NCCPBE*

The NCCPBE initially expressed a preference for its original majority configuration and adopted "no position at this time upon any alternative . . . ."[37] Hitherto unconvinced that Wilmington and DeLaWarr possess sufficient physical capacity to educate three grades of students, the NCCPBE has continued to withhold active support of the 9–3 concepts.[38] The legal stance of the NCCPBE is that because all pupil assignment concepts presently at issue satisfy the constitutional objective of conversion to a unitary racially non-discriminatory school system within the desegregation area,[39] the Court lacks authority to evaluate the fundamental fairness of the respective plans and concomitantly is bound by whichever concept the New Board endorses.[40] This NCCPBE posture necessitates delineating the respective roles of the Court and the New Board.

The role of the Court in this narrow remedial phase of this litigation is limited. In *Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977) ("*Milliken II*"), a *de jure* violation case, the Supreme Court emphasized that: "In the first case concerning federal courts' remedial powers in eliminating *de jure* school segregation, the Court laid down the basic rule which governs to this day: 'In fashioning and effectuating the [desegregation] de-

---

**33.** Alfred I. duPont ("Alfred I."), Marshallton-McKean, Mt. Pleasant, New Castle-Gunning Bedford, Newark, and Wilmington.

**34.** Upon request, the Pupil Assignment Committee worked in the courthouse in an area adjacent to chambers. In order to be insulated from community and employer pressure, the group functioned under an order restricting communication. *See* Doc. 640.

**35.** Ct.Exh. 101A. The report utilized the same projected 1977–78 enrollment data upon which the original majority and minority reports were based. Doc. 695P, at 67–68 (Transcript of Hearings of 11/29/77–12/6/77) (Carey) (The Court did not receive the transcript of the last day of these hearings until 12/29/77).

**36.** Ct.Exh. 101A, at 5. *See* text *infra,* at 997–998.

**37.** Doc. 656. The statement apparently applies only to the 9–3 alternatives. The NCCPBE majority previously had demonstrated its dissatisfaction with Plan W.

**38.** Doc. 667. The NCCPBE has stated, however, that "if . . . [capacity] concerns can be alleviated, the Board is fully prepared to implement a 9–3 plan." *Id.* 2.

**39.** With respect to the NCCPBE majority plan (10–2), plaintiffs assert that it is constitutionally defective because the "process of adopting 10–2 *and* the very premises underlying 10–2 constitute either official racial discrimination standing alone or represent racially unacceptable discrimination in the remedial context." Doc. 668, App. B, at 1. As a result of the method of analysis employed, these constitutional questions are expressly left open. It is observed, however, that a plan may be so unfair as to constitute invidious discrimination. *Allen v. Asheville*, 434 F.2d 902, 905 (4th Cir. 1970).

**40.** Doc. 671, at 6: "[I]t is not for this Court to decide which of several possible plans is preferrable [*sic*] if each is constitutionally acceptable."

crees, the courts will be guided by equitable principles.' *Brown v. Board of Education,* 349 U.S. 294, 300, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955) (*Brown II*)." Instructing that "[a]pplication of those 'equitable principles' . . . requires federal courts to focus upon three factors," the Court stated:

"In the first place, like other equitable remedies, the nature of the desegregation remedy is to be determined by the nature and scope of the constitutional violation. *Swann v. Charlotte-Mecklenburg Board of Education, supra,* 402 U.S. 1 at 16, 91 S.Ct. 1267, at 1276, 28 L.Ed.2d 554. The remedy must therefore be related to 'the *condition* alleged to offend the Constitution . . . .' *Milliken I, supra,* 418 U.S., at 738, 94 S.Ct., at 3124. Second, the decree must indeed be *remedial* in nature, that is, it must be designed as nearly as possible 'to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct.' *Id.,* at 746, 94 S.Ct., at 3128. Third, the federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution. In *Brown II* the Court squarely held that '[s]chool authorities have the *primary* responsibility for elucidating, assessing, and solving these problems . . . .' 349 U.S., at 299, 75 S.Ct., at 756. (Emphasis supplied.) If, however, 'school authorities fail in their affirmative obligations . . . judicial authority may be invoked.' "

*Id.* (footnotes omitted). Finally, the Supreme Court noted that "[o]nce invoked, 'the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.' " *Id.*

Although *Milliken II* was primarily addressed to ancillary remedial relief, its explication of equitable considerations applies also to pupil reassignment.[41] In the present case, when the Supreme Court summarily affirmed the existence of an inter-district violation, "the condition alleged to offend the Constitution" was established. The remedial nature and scope of the decree was determined with finality by virtue of the denial of certiorari of the Third Circuit's affirmance of the three-judge court remedial order. With two components resolved beyond peradventure, remaining are only the directive that due regard should be afforded state and local authorities and the maxim that a district court has broad equitable power to remedy past wrongs. Application of these precepts to the issue of the amount of deference properly accorded the NCCPBE requires an examination of the unique status of that body.

The historical predecessor to the NCCPBE was a five person Interim Board appointed by defendant State Board of Education pursuant to the three-judge court May 19, 1976 remedy opinion.[42] In order to afford each district at least one representative, the Interim Board was expanded to thirteen members[43] by the Delaware State Legislature pursuant to authority given that body by the three-judge court.[44] The Third Circuit understandably did not know of the subsequent expansion to thirteen members.[45] Accordingly, paragraph four of the circuit court's mandate called for the appointment of a five member board by the State Board of Education in the event local officials failed to promptly act.[46]

---

41. *See Milliken I, supra; Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

42. 416 F.Supp. 328 (D.Del.1976).

43. *See* n. 22 *supra,* p. 987.

44. 416 F.Supp. at 357.

45. The Third Circuit was reviewing only the June 15, 1976 three-judge court primary remedial order. As such, the circuit court's record probably did not contain any reference to legislative action occurring subsequent to June 15, 1976.

46. 555 F.2d at 381. Paragraph four of the circuit court's mandate was virtually a verbatim restatement of the three-judge court decree. Relying on the system of reorganization contemplated by the State of Delaware Educational Advancement Act, the three-judge court decided on a board of five members. Although recognizing that each existing board would not

Following the failure of the State to act in accordance with the Third Circuit mandate,[47] this Court directed defendant State Board[48] to appoint the five member "New Board."[49]

Against this procedural background, attention is turned to the primary contention of the NCCPBE that it has broad discretion which cannot be disturbed because its 10–2 concept accomplishes the constitutional objective of transition to a racially non-discriminatory unitary school system in the desegregation area. The NCCPBE reaches this conclusion by claiming the status either of a court-appointed master whose choice of pupil assignment concept can only be disturbed under the clearly erroneous test of F.R.Civ.P. 53(e)(2),[50] or of a full fledged school board vested with broad discretion in formulating a remedy.

■ That the NCCPBE is a court-appointed master pursuant to Rule 53 is a wholly untenable proposition. First and foremost, the membership of the NCCPBE was appointed by defendant State Board of Education, not by the Court. Not surprisingly, no authority has been cited or found that provides for the power of appointment of a master under F.R.Civ.P. 53 inhering to a party litigant. A fortiori, no authority has been found for the astounding proposition that under the clearly erroneous standard of F.R.Civ.P. 53(e)(2), a federal court is bound by factual findings of a "master" appointed by a party defendant. Second, although F.R.Civ.P. 53(b) contemplates issuance of an order of reference to establish the exceptional condition requiring a master, no such step was taken here. Third, the mandate of the Third Circuit and the August 5, 1977 order of this Court instructing the NCCPBE to develop a plan for desegregation in no way authorize the NCCPBE to make findings of fact binding on this Court.[51] *Cf. Morgan v. Kerrigan,* 530 F.2d 401, 411 n. 13 (1st Cir.), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 386 (1976) (Boston masters not empowered to make findings of fact). Consequently no legitimate basis exists for con-

be directly represented, the court preferred to follow state law rather than devise an independent means of selection. 416 F.Supp. at 357–58.

47. Paragraph 2 of the Third Circuit order provided that the 11 districts "shall be reorganized into a new or such other new districts as shall be prescribed by the state legislature or the State Board of Education, so long as such prescription . . . eliminat[es] the dual school system . . . and the vestige effects of de jure segregation." 555 F.2d at 381. Paragraph 4 became relevant only upon default by state officials with respect to paragraph 2. For a full explanation of what occurred, see *Evans v. Buchanan,* 435 F.Supp. 832 (D.Del.1977).

48. The membership of the State Board is appointed. *See* 14 *Del.C.* § 101(b).

49. 435 F.Supp. at 848. The New Board subsequently adopted the name "New Castle County Planning Board of Education." (NCCPBE).

50. F.R.Civ.P. 53(e)(2) provides in pertinent part:

"(2) *In Non-Jury Actions.* In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous."

51. Illustrative operative paragraphs of this Court's August 5, 1977 Order are:

"4. Immediately upon appointment, the New Board shall begin to develop a plan for the desegregation of the public schools in the area . . . in September, 1978 in accordance with the Opinion of the Court of Appeals for the Third Circuit . . . . The New Board shall commence immediately to consider any planning necessary for the transfer to it of operating authority.

 \* \* \* \* \* \*

"7. As described in the Opinion issued this date in the above-captioned matter, the New Board shall submit its plan for the operation of a unitary school system to the State Board of Education for evaluation and comments with respect to the practical implementation of the plan. . . . After receipt of said evaluation and comments, the New Board and State Board of Education shall confer intensively and extensively to resolve any differences over implementation of the New Board's plan. Should any dispute prove irresolvable, the New Board shall submit to the Court its plan together with a statement of the disputes outstanding and the reasons in support of its position. The State Board of Education also shall submit to the Court a statement of the disputes outstanding and the reasons in support of its position with respect to the practical implementation of the plan."

cluding that the NCCPBE is a master for purposes of F.R.Civ.P. 53.

The NCCPBE's contention that it should be considered a body politic, i. e., a school board, is premised upon the derivation of its manner of appointment [52] and the explicit requirement that the NCCPBE function as a school board. If the NCCPBE were truly a body politic created through democratic processes, its position would be entitled to considerable deference because "[s]chool authorities have the primary responsibility for elucidating, assessing, and solving these problems" [53] and no other comparable means exist "to take into account the interests of state and local authorities in managing their own affairs . . . ." [54]

The NCCPBE position contains two basic fallacies, one factual and the other legal. The factual fallacy is that the NCCPBE is not a true body politic. It was not elected by popular vote as are nine of the eleven litigant school boards.[55] At most, it represents the best efforts of the three-judge court and the Third Circuit to establish a governance unit in a fashion in accordance with the legislative will. But the State of Delaware through its General Assembly expressly disowned and disavowed the NCCPBE and its 10–2 proposal.[56] In addition, defendant State Board of Education initially declined to pay its court-ordered share of expenses of the NCCPBE.[57] Thus the present judicially created and de-

52. As previously noted, the three-judge court attempted to reconcile the appointment process with the Educational Advancement Act of the State of Delaware. Thus the NCCPBE has argued that it was appointed in a manner appropriate under Delaware law and that, accordingly, it should be regarded as would be any other duly constituted school board. Doc. 671, at 5.

53. *Brown II, supra,* 349 U.S. at 299, 75 S.Ct. at 756.

54. *Milliken II, supra,* 97 S.Ct. at 2757.

55. The board of Alexis I. is appointed by the Resident Judge of the Superior Court for New Castle County. 14 *Del.C.* § 1062(a). The Wilmington School Board is also appointed. 14 *Del.C.* § 1063.

56. PX 23, Senate Joint Resolution No. 29, passed on October 13, 1977, reads as follows:
 "WHEREAS, in the litigation known as *Evans v. Buchanan,* it is understood that the United States District Court for the District of Delaware ordered the State Board of Education of the State of Delaware to appoint a five-person new Board to plan for the implementation of an almost county-wide School District in New Castle County in connection with an Order of that Court which provides for, among other things, the elimination of eleven public school districts created under the authority of the General Assembly of the State of Delaware and their replacement by the Court-created single almost county-wide public school district; and
 "WHEREAS, the new Board was so appointed and we understand it has presented to the Court such a plan; and
 "WHEREAS, the 129th General Assembly of the State of Delaware does not recognize said new Board to be a duly constituted and representative Board of Education under the laws of the State of Delaware;

"NOW, THEREFORE:
 "BE IT RESOLVED by the members of the 129th General Assembly of the State of Delaware, the Governor concurring therein, that the findings, recommendations, policies and other actions of the five-person Planning Board appointed by the State Board of Education *are not actions or findings of the State of Delaware or any local school district in New Castle County,* notwithstanding any statement, rule or regulation of the State Board of Education to the contrary; and
 "BE IT FURTHER RESOLVED that *the action and policies of the New Castle County Planning Board of Education are not endorsed by the State of Delaware* and that unless the General Assembly takes effective action in support of any such actions or policies said actions and policies shall have only such force as they receive from orders of the United States Courts." (emphasis added).

57. PX 11. The pertinent portion of the refusal is contained in a September 15, 1977 letter from Kenneth C. Madden, State Superintendent of Public Instruction, to the Chief Administrator of the NCCPBE:
 "I am sure that you are aware that we did not receive a legislative appropriation for expenses of the New Board for this fiscal year and that it will be necessary for us to receive such appropriation before we can make our contribution. We plan to submit a request for a supplemental appropriation at the earliest possible time when the legislature is in session."
 After this matter was brought to the attention of the Court, the State Board of Education immediately found the necessary funds without benefit of a legislative appropriation. *See* Doc. 663H, at 3–9.

fendant appointed five person NCCPBE cannot be said to be a body politic representing the will of the people through its duly elected Legislature.

In contrast to the above, the five cases [58] primarily relied upon by the NCCPBE are inapposite because all involved school boards that were bodies politic existing by virtue of the democratic processes. The judicially created and defendant appointed NCCPBE expressly disavowed by the Delaware Legislature is not the usual body politic found in any desegregation case cited by any interested party or uncovered by the Court in its own research. Thus the Court declines to accept and/or approve unbridled discretion by the NCCPBE. Because the NCCPBE is factually and legally not a body politic, its position that "the Board's choice of plans can only be rejected by this Court if the result is constitutionally defective" [59] is disapproved.

Although the NCCPBE is neither a master nor a full fledged body politic, its presence is vital to successful implementation of a desegregation plan in New Castle County. Occupying a unique role heretofore unknown in the annals of desegregation litigation, the New Board is the only body empowered to govern the schools which has proposed a solution capable of effectuating a transition to a racially non-discriminatory unitary school system. Further, the NCCPBE has demonstrated its resolve to retain an open mind by stating it is "fully prepared to implement a 9–3" concept if the same can be effectively achieved under a specific pupil assignment plan.[60] Additionally, the NCCPBE willingly acquiesced in a procedure to protect its Pupil Assignment Committee from all outside influence. Given the high level of developed expertise and the demonstrated impartiality of the Pupil Assignment Committee, the Court is satisfied that the unique NCCPBE shows preliminary promise of working well in the area of pupil assignment. Equally important is the fact that the NCCPBE is going to be the responsible operating authority for the single unitary non-discriminatory school district. For these reasons, the Court must and wants to consider all helpful, well-reasoned, and documented conclusions of the maturing NCCPBE. Although not bound by the conclusions of that group, so long as the NCCPBE continues to seek responsible solutions in an impartial manner, its input will be accorded increasing weight by the Court in the exercise of its equitable power.[61]

### C. Proposed Concepts Before the Court—Description

Any pupil assignment concept intended to remedy the continuing inter-district violation must necessarily consider the composition and distribution of the student body throughout the desegregation area and the physical limitation of building capacity.[62]

58. *Swann v. Charlotte-Mecklenburg Bd. of Educ., supra*, 402 U.S. at 16, 91 S.Ct. 1267; *Darville v. Dade County School Bd.*, 497 F.2d 1002, 1004 (5th Cir. 1974); *Pride v. Community Sch. Bd. of Brooklyn*, 488 F.2d 321, 327 (2d Cir. 1973); *Allen v. Asheville, supra*, 434 F.2d at 905; *Moss v. Stamford Bd. of Educ.*, 356 F.Supp. 675 (D.Conn.1973).

59. Doc. 671, at 6.

60. Doc. 667. A computer print-out of necessary data for a detailed pupil assignment plan was expected on December 23, 1977. Upon instructions from the NCCPBE and, dependent upon those instructions, the Pupil Assignment Committee will presumably begin its work in January and require approximately eight weeks to make a specific fit by student and school. Ct.Exh. 101A, at 11.

61. Minority board member, Wendell Howell, has described the workings of the NCCPBE as a process to determine "who gets how much of what . . . ." Doc. 663F, at 59. However true in the past, the Court is satisfied the NCCPBE is turning its full attention to what I regard as its primary responsibility—assuring high quality racially non-discriminatory public school education for all children within the desegregation area.

62. Other permissible considerations include such matters as: desirability of retention of feeder patterns, programmatic needs, requirements of special education, economics of a facility, and need for flexibility. An impermissible consideration would be use of racial quotas; therefore, no attempt herein was made to secure a particular racial balance in any school, grade, or classroom. Doc. 663A, at 41 (Magat).

Thus, if the total number of children in the predominantly white districts [63] were mirrored in all important respects by the same total number of children in the predominantly black districts,[64] the burden of pupil reassignment theoretically could, but not necessarily would, be distributed evenly between the two groups with each being reassigned six years. But this theoretical mathematically equal disbursement of student population does not exist in Northern New Castle County. The two predominantly black districts of Wilmington and DeLaWarr contain in the aggregate far less student population [65] and, consequently, far less building capacity than the aggregate student population and building capacity of the nine predominantly white districts.[66] Accordingly, plaintiffs accept that under any desegregation plan "black children on the average will be reassigned to [what will be formerly racially identifiable] white schools a greater number of years than white children will be reassigned to [what will be formerly racially identifiable] black schools." [67] Given that the children from the predominantly black districts will be reassigned to the predominantly white districts for a significant portion of their education, the difference between the litigants

centers primarily upon how much of the disproportionate impact of pupil reassignment above that dictated by numbers and building constraints should be borne by the minority whose constitutional rights were violated.

Five proposed concepts are before the Court, two advanced by the NCCPBE and three submitted directly by the Pupil Assignment Committee: 1) The concept favored by the majority of the NCCPBE—the "10–2" configuration; 2) The concept endorsed by the minority member of the NCCPBE—"Plan W"; 3) A 9–3 configuration labelled the "S" concept, bottomed upon pairing elementary attendance zones in the Wilmington district with elementary attendance zones in eight predominantly white districts; 4) A 9–3 configuration utilizing an Independent Feeder ("IF") concept, which can be overlaid on any of the "S" concept illustrations; 5) A 9–3 configuration termed the "G" concept, predicated upon pairing grids [68] within the Wilmington district with elementary attendance zones in eight predominantly white districts.

Four of the five concepts presented divide the desegregation area geographically into four attendance zones.[69] Plan W em-

---

See *Evans v. Buchanan*, 555 F.2d 373, 380 (3d Cir.), *cert. denied*, 434 U.S. 880, 98 S.Ct. 235, 54 L.Ed.2d 160, 46 U.S.L.W. 3220 (1977).

**63.** Alfred I., Alexis I., Claymont, Conrad, Marshallton-McKean, Mt. Pleasant, New Castle-Gunning Bedford, Newark, and Stanton.

**64.** DeLaWarr and Wilmington. Reference to predominantly black districts and predominantly white districts is to currently existing districts. Of course, at the end of the desegregation process under existing judicial decrees there will be only one district with a racially non-discriminatory school system.

**65.** The September 30, 1977 enrollment census indicates that in the desegregation area there are a total of 72,590 public school students in grades K–12 including vocational and special schools. Of this number, between 21.69% and 22.5%, and conceivably 22.95%, dependent upon how one adjusts for voluntary transfer students, *see* nn. 92–93 *infra*, pp. 1000–1001, live in the predominantly black districts. *Compare* PX 26 *with* D.P.I. Exh. 4 *and* D.P.I. Exh. 11. Of the 72,590 students, 16,187 or 22.3%

are black, the overwhelming majority residing in Wilmington or DeLaWarr. D.P.I. Exh. 4.

**66.** The seating capacity in the predominantly black district was estimated roughly during hearings to be 20,000. Doc. 663A, at 85 (Magat).

**67.** Doc. 668, at 7.

**68.** A grid is a word that has evolved to accommodate computer application to various problems. Any given area is "gridded" by dividing it into small contiguous zones. A grid is one of those small zones. In this case, the entire desegregation area has been gridded and a census thereafter applied to reflect racial composition of each grid. A grid is also known and has been referred to in trial testimony as a "geocode".

**69.** The four attendance areas are: Attendance Area I, consisting of a portion of Wilmington and the present Claymont, Mt. Pleasant, and Alfred I. districts; Attendance Area II, embracing another portion of Wilmington and the Alexis I., Conrad, Marshallton-McKean, and

ploys nine clusters. Apparently fortuitously, all concepts pair the DeLaWarr district with the New Castle-Gunning Bedford district, treating the combined geographic area as a distinct entity. As a necessary corollary, all concepts in one form or another have paired or clustered Wilmington with the remaining eight predominantly white districts.[70]

### 1. The NCCPBE Majority Proposal— The 10–2 Concept

The NCCPBE 10–2 majority concept reassigns all students from the two predominantly black districts to the predominantly white districts for ten years and all students from the predominantly white districts to the predominantly black districts for two consecutive years. The 10–2 concept anticipates retention of a minimum of ten grades in each of the predominantly white districts and limits Wilmington to grade centers of two years spanning grades 5 through 9 and DeLaWarr to eighth and ninth grades. As a consequence, under the NCCPBE majority 10–2 configuration all Wilmington and DeLaWarr children in grades 1 through 4, 10 through 12, and three other consecutive grades must necessarily attend schools located in the predominantly white districts. A concomitant result is that none of the high schools in the predominantly black districts is used as a high school.

### 2. The NCCPBE Minority Proposal— Plan W[71]

The NCCPBE minority proposal seeks to minimize the disproportionate impact upon black students during the transition from a dual system to a unitary racially non-discriminatory system by maximizing utilization of Wilmington school facilities. Recognizing that limitations on physical capacity of Wilmington schools preclude anything approaching a 6–6 plan,[72] Plan W endeavors to increase the average time that black students spend in their home district to something more than three, but less than four years.[73] Dividing the desegregation area into nine clusters and randomizing assignment patterns of both white and black students, Plan W results in a significant number of students from the predominantly white districts never being assigned to a predominantly black district.[74] Other children from the predominantly white districts

Stanton districts; Attendance Area III, composed of the remaining portion of Wilmington and the Newark district; and Attendance Area IV, pairing the DeLaWarr district with the New Castle-Gunning Bedford district.

70. Alfred I., Alexis I., Conrad, Claymont, Marshallton-McKean, Mt. Pleasant, Stanton, and Newark.

71. Defendant State Board and all intervening defendant predominantly white districts objected to presentation of the NCCPBE minority concept. The objectors variously asserted the Court was limited by the Third Circuit mandate, 555 F.2d at 382, to consideration of whatever the NCCPBE majority might offer and that the NCCPBE minority proposal was in reality a Wilmington district proposal. See Doc. 663A, at 12–22. Evidence on Plan W was admitted over objection and with full opportunity for cross examination.

72. Circumscribing a discrete area within the predominantly white districts containing a number of white children equivalent to the number of black children in Wilmington and DeLaWarr would allow a total exchange of students (an assignment of white children for six years in the formerly black schools and an assignment of black children for six years to the formerly white schools). But because the New Board's preference is to involve everyone throughout the defined desegregation area in the pupil reassignment scheme, assignments of six years for both black and white children are not mathematically possible.

73. Specifically, plaintiffs embracing Plan W recognize that capacity limitations in the two predominantly black districts compel the conclusion based on full utilization at state rated capacity that "students from the two [predominantly] black districts on the average would be reassigned to [what will be formerly racially identifiable] white schools for about 8.3 years and students from the nine [predominantly] white districts reassigned to [what will be formerly racially identifiable] black schools for about 3.7 years." Doc. 668, at 8.

74. For example, of 7,836 children from the Alfred I. district (NCCPBE Exh. 6), 4,735 would not be assigned to predominantly black districts, although other children from that area would be so assigned for up to four years. NCCPBE Exh. 21; PX 15; PX 19.

are assigned out of their former school districts for a minimum of two years to a maximum of seven years,[75] whereas students from the predominantly black districts attend a predominantly white district for a minimum of 5 years to a maximum of 10 years.[76] Finally, the NCCPBE minority concept purports to enhance walk-in use of three regional high schools.[77]

### 3. The 9–3 "S" Configuration

In undertaking to determine the feasibility of a 9–3 configuration, the NCCPBE through its Pupil Assignment Committee considered the following questions:

"1. Is it possible to develop a plan which assigns suburban children to schools in Wilmington and De La Warr for three years and Wilmington and De La Warr children to suburban districts for nine years?

"2. Can Wilmington and/or P. S. du-Pont High Schools be used as a grades 10–12 center? If yes, what plan results?

"3. Can De La Warr High School be used as a grades 10–12 center? If yes, what plan results."

Ct.Exh. 101A, at 4.

The Pupil Assignment Committee also employed another formulation to describe a part of their task:

Using three-grade centers and assuming that all students throughout the eleven districts are treated equally between rather than within racial groups to the fullest extent feasible, what plan results? Can P.S. and/or Wilmington High School remain open as feeder high schools?[78]

In responding to the above questions, the Pupil Assignment Committee also considered whether a 9–3 concept was feasible while retaining certain distinctive characteristics of the 10–2 proposal. Consequently, the committee investigated whether a 9–3 configuration was possible if no Wilmington or DeLaWarr high school was used as a high school and the primary grades were offered only in the predominantly white districts. The response of the Committee came in the form of various illustrations and alternates. All demonstrate that a 9–3 concept is feasible provided noted concerns can be resolved.[79]

The three S illustrations ($S_1$, $S_2$, and $S_3$) and their alternates employ existing elementary attendance zones in all districts as the basic desegregation tool. In addition, the Pupil Assignment Committee in developing the three S concepts imposed upon itself certain perceived educationally sound assumptions and constraints.[80]

The $S_1$ illustration demonstrates the fit of a 9–3 configuration if all young elementary

---

**75.** Children in the present Alexis I. District would be assigned out of their district anywhere from 2–6 years; Claymont 3–7 years. PX 15; PX 19. Ordinarily, a child would not attend a Wilmington school for more than four years; however, some additional time may be spent in other than the home district as a result of a "lateral transfer". PX 15; PX 19. In the context of this litigation, a lateral transfer results when even though a child from a predominantly white district remains in attendance in a predominantly white district, the child does not attend the school he or she would have been expected to attend. A lateral transfer can occur within what are now predominantly white districts or across predominantly white district lines. The latter type of lateral transfer would occur under Plan W.

**76.** PX 19.

**77.** Designated are the two Wilmington high schools, Wilmington High School and P.S. duPont High School, and predominantly white Mt. Pleasant High School.

**78.** Ct.Exh. 107.

**79.** Ct.Exh. 101A, at 5.

**80.** "1. No students in grades 1–3 should be assigned to buildings constructed as middle or high schools.

"2. No students in grade 7 or above should be assigned to elementary school buildings.

"3. Middle schools or junior high schools (buildings currently housing grade patterns between 5 and 9) can be used to house grade spans 4 through 9.

"4. Kindergarten students should be housed in neighborhood elementary schools and should be counted as half-time students.

"5. No high school student (grades 10–12) should be assigned to any building which was not constructed as a high school.

"6. No high school (grades 10–12) should have a student enrollment of less than 600 students, with the preference being not less than 750 students. These minimum enroll-

children and high school students attend school in the predominantly white districts.[81] The alternates to $S_1$ demonstrate the feasibility of a 9–3 concept using one [82] of the Wilmington high schools as a high school in conjunction with an Attendance Area II high school.

The $S_2$ model includes early elementary grades by providing for different three year grade spans to be assigned from each of three attendance areas.[83] Accordingly, grades 1–9 are offered in Wilmington. The $S_2$ alternate illustrates the feasibility of using a Wilmington high school as a high school in conjunction with Attendance Area I high schools. Several possibilities emerge for designating one city high school as a 7–12 or 10–12 grade center in a pairing arrangement with a junior high school and senior high school in the predominantly white districts.

Also resulting in a grade span of nine years in Wilmington, the $S_3$ illustration modifies $S_2$ by exchanging the grade spans which Attendance Areas I and III send to Wilmington. The $S_3$ alternate employs an Attendance Area III high school as a 7–12 grade center to permit one of the Wilmington high schools to be used as a similar grade center.

The primary concerns expressed by the Pupil Assignment Committee with respect to the S concept are possible overutilization of schools, particularly in Wilmington, and the conflict between strict retention of feeder patterns and the desirability of assignments to nearby schools.[84] Underutilization of some facilities was also noted by the Committee as a matter of some concern.[85]

### 4. The 9–3 "IF" Configuration

Unlike the S concepts which utilized existing elementary attendance zones and the four attendance areas created by the NCCPBE, the Independent Feeder ("IF") concept combines some of the so called grids or geocodes of predominantly white Alexis I. and Conrad with geocodes of Wil-

ments are based on the lowest existing high school enrollments in the desegregation area of New Castle County and represent what the committee feels is the minimum number of students necessary to provide a comprehensive high school program.
"7. Wilmington students, especially in the elementary grades K–6, should be as close to 'home' as possible when assigned to city schools for the 3-grade span.
"8. Suburban-city feeder patterns should remain intact whenever possible."
The Pupil Assignment Committee also noted that:
"When tested against the data, assumptions 7 and 8 above tend to be in conflict. Configurations which rigorously adhere to feeder patterns do so at the expense of school proximity. This dichotomy exists because of the following data considerations:
"(a) The total capacity of Wilmington schools within each attendance area is not sufficient to house any single 3-grade span within its area under assumptions 1, 2 and 3, except for grades 4–6 in Attendance Area 3.
"(b) Schools in adjoining attendance areas can be used as "overflow" buildings if an adjoining area is on a different 3-grade span (elementary as opposed to secondary).
"(c) Any 9–3 configuration based on present elementary feeder patterns must therefore utilize facilities outside its own attendance area."

Ct.Exh. 101A, at 13–14. This conflict between strict adherence to feeder patterns and school proximity also arises in the 10–2 proposal with respect to children in Wilmington. Doc. 663A, at 53–54 (Magat).

**81.** The NCCPBE majority 10–2 plan employed a grade span of 5 through 9 in the predominantly black districts. The S1 concept uses a grade span of 4 through 9.

**82.** The Pupil Assignment Committee perceived that one could not utilize both Wilmington high schools as 10–12 grade centers under the alternates to S1, S2, and S3. Doc. 695P, at 147–50 (Carey); Ct. Exh. 101A, at 17.

**83.** Attendance Area I (7–9); Attendance Area II (1–3); and Attendance Area III (4–6).

**84.** S3 manifests rigorous adherence to feeder patterns and has the effect of placing children outside their attendance areas when they return to Wilmington. S2 attempts to retain feeder patterns but fails to a slight degree. S1 breaks feeder patterns to return children to area schools.

**85.** Underutilization of some facilities is an inherent problem in all presented concepts. The problem is caused by declining enrollment, unrelated to and largely independent of the instant litigation. *See* text *infra,* at 1005.

mington. Feeding the children from designated residential tracts into Wilmington High School for their high school experience, the IF concept may be viewed as carving out an additional attendance area consisting of five schools which collectively provide a full 1–12 grade span.

The Pupil Assignment Committee concluded it was possible to superimpose the IF illustration on any of the S illustrations. Although noted concerns would not appreciably change for any of the S illustrations, the self-contained IF area as distinguished from its larger attendance area would have a less serious problem with overutilization, no problem with underutilization, and could be easily expanded or contracted by adding or subtracting geocodes. Aside from the obvious drawback of limited application in the desegregation area, the IF approach evoked some concern over lateral transfers between districts in the predominantly white Alexis I. and Conrad districts.[86] Although the matter was not explored fully, a cursory review of the IF concept as applied to P.S. duPont High School convinced the Pupil Assignment Committee such an arrangement was not feasible because of inability to obtain sufficient students without going beyond the physical location of predominantly white high schools. Finally, the Pupil Assignment Committee was unable to predict compatibility of the IF concept with the third 9–3 configuration, the G concept.

### 5. The 9–3 "G" Concept

The G concept combines geocodes in Wilmington with elementary attendance areas in the predominantly white districts.[87] Use of geocodes necessarily results in new elementary attendance zones in Wilmington. Specifically, three elementary attendance area zones emerge, conforming to Attendance Areas I, II and III of the 10–2 plan. Comparison of the new geocoded elementary attendance zones in Wilmington with the existing Wilmington elementary attendance zones immediately reveals the geocoded elementary attendance zones to be far more compact. As a result, Wilmington students are able to attend schools close to their homes during their three years in Wilmington. Employing geocodes to establish elementary attendance zones derives other advantages enumerated in a later section of this opinion.[88]

### 6. Attendance Area IV

The geographic area comprising the DeLaWarr and New Castle-Gunning Bedford districts is considered a separate Attendance Area under each of the proposed concepts. Under the NCCPBE majority 10–2 proposal, grades 8 and 9 attend three of the five DeLaWarr schools;[89] grades 1 through 7 and 10 through 12 are offered only in the predominantly white New Castle-Gunning Bedford District. Plan W, by attempting randomization of pupil selection and proposing utilization of DeLaWarr High School as a regional high school, attempts to minimize the disproportionate burden borne by children in DeLaWarr.

The 9–3 feasibility study also pairs the predominantly black districts of DeLaWarr

---

86. Because lateral transfers pervade the IF concept, some view IF as an undesirable scheme that isolates five schools from the area as a whole.

87. With the exception of the limited IF proposal, none of the concepts before the Court attempts to combine geocodes in Wilmington with geocodes of the predominantly white districts. Employment of geocodes can cause a student to attend a school other than that which he would otherwise attend (lateral transfer). Lateral transfers were a matter of concern among the predominantly white districts because of the tendency at this point in time for identification with one's district. In a one district governance unit, this concern likely will dissipate with time. If this assumption proves

correct, the NCCPBE at some future point may find it desirable to assign students in the predominantly white districts to schools closer to their homes and thus achieve transportation cost savings. Because unnecessary lateral transfers between predominantly white districts neither aid nor impede the conversion to a non-discriminatory unitary school system, the matter is properly left to the NCCPBE.

88. See text infra, at 1005, 1008.

89. DeLaWarr High School, Eisenberg Middle School, and Colwyck. Rosehill and Dunleith are left "open to assignment", creating a concern that they will be closed.

with the predominantly white district of New Castle-Gunning Bedford to form Attendance Area 4. Within that precept, three options are enumerated. Under option 1, only grades 4–6 are provided in DeLaWarr; under option 2, grades 4–6 and 10–12 are offered in DeLaWarr; and under option 3, DeLaWarr would house grades 1–9. Option 3 strives to attain a better "fit" by splitting the geographic area of DeLaWarr into two subdivisions [90] and treating one portion as though it were within the predominantly white district of New Castle-Gunning Bedford. In so doing, option 3 reduces DeLaWarr to two elementary school buildings and one high school building. As in option 1, all students in Attendance Area IV then attend only grades 4–6 in the "revised" DeLaWarr District.

### D. Merits of the Proposed Concepts

The foregoing plans having been submitted to the Court, its duty is to review these proposals against the principles enunciated by the Supreme Court and the Third Circuit. Under the mandate of *Brown I, supra,* the duty of the Court is to insure the elimination of the inter-district racially discriminatory dual school system that has persisted in New Castle County. *Evans v. Buchanan,* 379 F.Supp. 1218 (D.Del.1974), and 393 F.Supp. 428 (D.Del.), *summ. aff'd,* 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975). In formulating the appropriate remedy to redress the systemwide violation, the three-judge court relied heavily on the guidance provided by *Milliken I, supra,* and *Swann, supra.* Elucidating upon the basic tenet that "the nature of the violation determines the scope of the remedy", *Swann,* 402 U.S. at 16, 91 S.Ct. at 1276, the Supreme Court in *Milliken I* cautioned that the effort "to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such con-

duct" does not constitutionally require "any particular racial balance in each 'school, grade, or classroom'." 418 U.S. at 740–41, 94 S.Ct. at 3125 (quoting *Swann,* 402 U.S. at 24, 91 S.Ct. 1267). Noting its acceptance of desegregation plans rendering schools more than 50% black,[91] the Supreme Court stated that such results are not offensive to the Constitution and do not justify an inter-district remedy where only an intra-district violation has been identified. Where, however, the constitutional violation is of systemwide magnitude and an inter-district remedy is mandated, attention must be focused on whether the remedial process is governed by the appropriate exercise of equitable power. At this stage, one becomes mindful that "the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann,* 402 U.S. at 15, 91 S.Ct. at 1276.

Because the inter-district extent of the violation and the inter-district scope of the remedy have previously been confirmed in this case, the limited remaining judicial task is to assure and effectuate implementation of a scheme that eliminates the dual school system and extirpates the vestiges of impermissible racial discrimination perpetuated in Delaware by *de jure* segregation of public schools.

In so doing, the Court draws on its powers in equity which have been well defined in desegregation cases such as *Brown II, supra, Swann, Milliken I, Milliken II, supra,* and *Hills v. Gautreaux,* 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976). Central to these cases is recognition that the task of righting discrimination necessarily entails considering not only what is fair but also what is practical. Specifically, the Supreme Court has advised that equity traditionally "has been characterized by a

---

**90.** The dividing line is Interstate Route 295, a major highway artery which intersects the present DeLaWarr District.

**91.** Racial compositions of 66% black and 34% white were not considered fatal to desegregation plans in *Milliken I* and *Wright v. Council of the City of Emporia,* 407 U.S. 451, 92 S.Ct.

2196, 33 L.Ed.2d 51 (1972). A plan resulting in racial compositions 77% black and 22% white was implicitly approved in *U. S. v. Scotland Neck Board of Education,* 407 U.S. 484, 92 S.Ct. 2214, 33 L.Ed.2d 75 (1972). *See Milliken I,* 418 U.S. at 717 n. 22, 94 S.Ct. 3112.

practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs." *Brown II*, 349 U.S. at 300, 75 S.Ct. at 756 (footnote omitted). In this case, the Third Circuit has recognized that a judicial decree to effectuate desegregation must necessarily take "into account the practicalities of the situation" lest a court order into effect a plan falling fatally short of its desired goal. 555 F.2d at 379 (quoting *Davis v. Board of School Commissioners*, 402 U.S. 33, 37, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971)). For example, although a dual school system would cease to exist if all public schools in Northern New Castle County were closed, such an alternative could hardly be termed a reasonable attempt to meet constitutional standards. *See Griffin v. County School Board of Prince Edward Co.*, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964). Similarly, a 12–0 configuration, assigning all students from the predominantly black districts to schools in the predominantly white districts would result in a conversion to a non-discriminatory unitary school system but, absent special circumstances not present here, one could not successfully contend such a proposal should be upheld by a court sitting in equity. *See Evans v. Buchanan*, 435 F.Supp. 832 (D.Del.1977). It follows that the means employed to accomplish desegregation must necessarily be considered against the practicalities and equities of the situation in order to insure that a desegregation scheme is just in application and possesses a reasonable probability of success.

Because this is not a case requiring a court to devise its own plan due to a total abdication by local authorities, the Court in no way presumes to dictate the type of education that must occur in Northern New Castle County. Despite its long, tortuous history and the failure of the Legislature to respond, the case at this stage is not characterized by recalcitrance and obdurance. Several reassignment concepts have been submitted to the Court, demonstrating a high level of responsibility by the NCCPBE, the Pupil Assignment Committee, and Delaware educators. Matters of educational programming and quality of education are properly the province of educators, not that of the Court. Testimony in this case demonstrates that Delaware educators are highly qualified to make such determinations and the Court does not purport to substitute its judgment for theirs. Accordingly, the Court narrowly visualizes its duty as one of ordering into effect a scheme for desegregation that meets the constitutional goal in a practical and equitable manner.

 Not all agree; all parties to this action with the exception of plaintiffs and intervening defendant DeLaWarr District perceive no need for the Court to issue any order on pupil assignment. Relying on current legislation permitting voluntary transfers for 1977–78,[92] defendant State Board and defendants from the nine predominantly white districts maintain that the opportunity afforded a student to transfer to a school in which his race is a minority is adequate to overcome the dual school system and the pervasive effects of *de jure* segregation. Not only is the evidence to

**92.** Voluntary transfers were theoretically possible for a long time in Delaware. But because permission was required by both the sending and admitting schools, actual transfers were rather infrequent. Voluntary plans predicated on then-existing legislation were documented and rejected by the three-judge court. 416 F.Supp. at 344–46. In response to the June 15, 1976 order from the three-judge court on remedy, the Legislature provided that in the 1976–77 school year any student could transfer to any district that would accept him. Subsequently, two predominantly white districts refused to accept any transferees, white or black; another accepted only black students; and the Wil-

mington School District impeded transfer of its white students by refusing to forward their records. Modified legislation required all districts in 1977–78 to accept the application of any student whose race is underrepresented in the transferee school so that black students from Wilmington and DeLaWarr may transfer to the predominantly white districts and white students from the predominantly white districts may transfer into Wilmington and DeLaWarr. D.P.I. Exh. 5B, at 11. As the law was directed to 1977–78 only, one cannot presage what the Legislature would have done for the school year 1978–79 and thereafter.

the contrary,[93] but the voluntary transfer legislation suffers from the basic flaws that proved fatal to the State Board's alternate proposal known as "reverse volunteerism". The latter provided for the mandatory assignment of black students to predominantly white district schools but permitted any student subsequently to opt out. Depending on a number of variables, not the least of which was the receptivity of the predominantly white districts in welcoming black students, the number of blacks who could be expected to accept their assignments and thereafter continue in those schools was indeterminate. Absent any evidence that the plan would work and given the more than 20 years that the State has had to dismantle its dual system, this Court concluded that the plan's disparate burden and "too little, too late" character rendered it unacceptable under *Green v. County School Board*, 391 U.S. 430, 438–39, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). 435 F.Supp. 832, 841 (Del.1977). The voluntary transfer plan promises even less. Requiring affirmative independent action by a large number of individuals, it does not describe a plan that "promises realistically to work *now*," *Green, supra*, 391 U.S. at 439, 88 S.Ct. at 1694, and consequently at this late date cannot be the basis of a desegregation order for Northern New Castle County.

The Court recognizes that *Green* does not *per se* invalidate all voluntary plans but rather requires review of their effectiveness. The voluntary transfer plan which has attracted so few white students into the predominantly black districts fails to meet the constitutional objective. Although it is black students represented by the Wilmington School District who have sought relief from the affirmed constitutional violation, it does not follow that they, the aggrieved party, should assume full responsibility for rectifying the wrongs directed at them. Ordinary fair play would appear to dictate the opposite result or, at the least, an attempt to minimize the impact visited on those who have been wronged. In this regard, the Court is not totally insensitive to the dismay and anger experienced by some white citizens who must assume responsibility for violations arising out of discriminatory laws enacted in the past over which they exercised little or no control. However sincere and strongly held, such beliefs fail to recognize that widespread discrimination, sanctioned by law, was practiced in Delaware in contravention of the United States Constitution and that today the effects of that condition persist in the form of separate but equal school systems in the desegregation area in violation of *Brown I, supra*.

■ The State Legislature, although allotted an unprecedented amount of time, has defaulted, not even enacting enabling legislation to permit defendant State Board to address this constitutionally impermissible condition. In addition, defendant State Board fairly can be characterized as channeling its energies toward preservation of its legal position, rather than attempting to redress the constitutional violation. In view of this default, the Court's duty is to implement a remedy, the parameters of which have been established by the three-judge court's primary remedial decree. To accomplish this end, a proper, though not sole, consideration is an awareness of the desirability of minimizing the disproportionate burden on any racial group in choosing a concept that effectively desegregates within the established parameters. Curing the constitutional infirmity requires assignment of students for some period of time to schools which they otherwise would not have attended. Obviously transportation to these schools is necessary. But children in Northern New Castle County are presently transported to school by bus to a large degree.[94] Nonetheless, implementation of a desegregation plan within the fixed param-

---

**93.** As of August 1977, only three white students had elected to participate in the voluntary transfer plan. 435 F.Supp. at 837 n. 14. No evidence suggests that there has been a significant increase in that number. In contrast, some 2,000 black students transferred out of Wilmington and DeLaWarr. NCCPBE Exh. 9; Doc. 663A, at 176 (Kirk).

**94.** *See* n. 132 *infra*, p. 1012.

eters of the primary remedial decree represents change and thus must be approached with great care and always in a fair and practical manner.

■ With these considerations in mind, the Court must evaluate the merits of the 10–2, Plan W, and 9–3 concepts. Analyzing first the NCCPBE majority 10–2 plan, the Court finds the concept presently undesirable as a remedy to cure the constitutional infirmity in this case because of a number of perceived weaknesses. Specific examples are the basing of a decision adverse to black students on a grade fraction favorable to black students, reassigning only black children in the tender elementary years, and failing to use any of the black high schools as 10–12 grade centers. The probable result would be a disproportionate number of black schools targeted for closing, causing concomitant adverse effects and impeding the plan's chance for success.

The concept of 10–2 was generated by multiplying the 21.7% figure for black students in the affected area by twelve grades to determine that 2.6 was the number of grades requiring white reassignment in order to produce a "complete mix".[95] Having arrived at a number closer to three than two grades, the New Board arbitrarily chose to assign children from predominantly white districts the lesser number of two years, thereby requiring the reassignment of children from predominantly black districts for ten years rather than nine.[96]

In anticipation of assigning children from predominantly white districts to schools in the predominantly black districts for two years, the NCCPBE proceeded to establish two year grade centers in Wilmington and DeLaWarr while retaining almost a full range of grades in the formerly white districts.[97] Some children from the predominantly white districts would be educated in Wilmington for grades 5 and 6; some for grades 6 and 7; others would come into the city for 7th and 8th grades; still others for 8th and 9th grades. In DeLaWarr, children from the predominantly white districts would be assigned only to grades 8 and 9.

The decision not to use any of the black high schools as high schools under the 10–2 concept is conceivably explained by reference to the principle that all children in the desegregation area are to be treated equally and by acceptance as educationally desirable that a student should attend a given high school for at least three years. But this reasoning surrenders much of its attraction when used as an underpinning to support a decision not to use any of the three black high schools as high schools. The decision becomes more questionable when one notes that Wilmington High School is in excellent physical condition, is one of the few schools in the desegregation area to boast a swimming pool, and is close to a municipal golf course. Finally, the choice becomes particularly dubious when one realizes that Wilmington High School is strategically located for desegregation purposes on a district line in a corner of the Wilmington District. As a result, if Wilmington High School were simply moved across a relatively narrow road in a westerly direction (a distance of no more than sixty feet), it would be in the predominantly white Alexis I. District; or, if moved one block in a southerly direction, Wilmington High School would be in the predominantly white Conrad District.

Additional considerations further imperil the 10–2 concept. Credible testimony to the effect that the primary and high school

---

95. Of necessity, the NCCPBE utilized projected enrollments. Actual enrollments as of September 30, 1977 indicate that 22.3% of students in the affected area are black, D.P.I. Exh. 4, yielding the number 2.676.

96. Testimony fails to provide justification for this decision. *See* Doc. 663A, at 154–56; Doc. 663E, at 104–05 (Kirk).

97. Although no one attendance area offers a full range of grades, all grades are offered somewhere throughout the predominantly white districts. For example, when children from the predominantly white districts in Area I attend grades 6–7 in the predominantly black districts, the predominantly white districts in Area I do not offer these grades, but they are provided in the predominantly white district in Area III.

grades are perceived as the most important grades indicates that the less important grades were assigned to the predominantly black districts.[98] Concern was intimated over the prospect of children from the predominantly white districts travelling to school by bus in the primary grades; the worry was obviated by the expedient of assigning all children from the predominantly black districts to travel to the predominantly white districts during those years. No mention was made that the parents of those children from the predominantly black districts might be equally concerned about their children's transportation in the early years. Also, failure to reassign any child in the predominantly white districts for grades 1–4 or for the high school years necessarily reduces the number of grades which the former black schools can offer. Moreover, plaintiffs point out that with a surplus capacity in the county as a whole, severe underutilization of the city schools will inevitably target them for closing.[99] Arguably, these anticipated school closings, the conversion of the Wilmington high schools to grade centers, and the attendant demise of the Wilmington high schools as high schools will both identify the formerly black schools and create widespread misapprehension that something was wrong with the formerly black schools in the first place.[100] Plaintiffs maintain the negative impact of such misconceptions upon both black students generally and white students assigned to these schools will have a deleterious effect upon the entire effort to desegregate.

Serious additional equitable questions are also raised by the 10–2 plan. First, given that most black children need be assigned nine or ten years out of their neighborhood

schools and most white children only two or three years, the New Board, without detailing its reasons, chose to maximize that disproportionate burden on black students by assigning them ten years. The Court is fully cognizant that the law does not demand absolute parity among groups. Nonetheless, approval of plans resulting in disproportionate impact generally rests upon ample justification. For example, in *Allen v. Asheville, supra,* the court approved a plan primarily in which black students were transported during grades 1–5 because white students bore the burden during grades 6–12 and alteration of this arrangement would have increased the transportation expense unnecessarily without corresponding benefit to either group. *See Norwalk Core v. Norwalk Board of Education,* 423 F.2d 121, 124 (2d Cir. 1970); *Hart v. County School Board of Arlington Co., Va.,* 329 F.Supp. 953 (E.D.Va.1971). Other courts have viewed peculiar circumstances to justify school closings in black neighborhoods. *See, e. g., Mims v. Duval County School Board,* 329 F.Supp. 123 (M.D. Fla.), *aff'd,* 447 F.2d 1330 (5th Cir. 1971). Obviously a student does not have a right to attend the school building of his or her choice and should a formerly black junior high school be converted to a magnet school for the gifted, *Hart v. Community School Board of Education,* 383 F.Supp. 769, 772 (E.D.N.Y.1974), *aff'd,* 512 F.2d 37, 53–54 (2d Cir. 1975), or a certain school closed because it is physically unsound and located in a dangerous and noxious neighborhood, no one can be heard to complain. *See Mims, supra.*

The plenary power of a school board to utilize or close a given school building as

---

**98.** *E. g.,* Doc. 596B, at 490 (Transcript of Hearings of 7/17/77–7/25/77) (Minter): "[W]e consider the primary grades, one through three, as most important, I think, in determining what a youngster is going to do or be able to do in acquiring basic skills." *See id.* 489–92.

**99.** Under the 10–2 plan Wilmington schools that are used are employed only to about 30% of capacity.

**100.** Plaintiffs suggest that conversion of Wilmington High School and P.S. duPont High School into middle grade centers without consideration of the excellent physical facilities of these schools manifests a similar insensitivity or bias on the part of the NCCPBE. In this regard, one member of the New Board testified that the decision not to use either of these high schools as high schools had nothing to do with their educational quality or physical structure. Doc. 6630, at 115–16 (Scarborough).

it should see fit is not challenged here. What is open to question is whether a plan to provide a unitary racially non-discriminatory school system can, without reciting any underlying justification, transport black children a greater number of years than is necessary to accomplish the goal and simultaneously eliminate most grades in predominantly black districts when a practical alternative appears to exist. The answer arising out of principles of equity is no. At the very least, fundamental fairness demands that decisions that have the effect of maximizing the burden on black students be supported by justifications of a non-racial nature.[101] The instant record is devoid of any supportable explanation why a 10–2 plan was preferred to a 9–3 scheme or why a 9–3 arrangement was not seriously considered in the first instance.

Accordingly, the Court at this time must withhold approval of the 10–2 plan.

The Court also questions the validity of Plan W. Although it too would effectuate a transition to a unitary racially nondiscriminatory school system and therefore meets the constitutional objective, Plan W holds scant promise of satisfactory implementation. Advanced as a minority report of the NCCPBE, Plan W has attracted the support of neither the New Board, defendant State Board, or defendant predominantly white districts, all of which generally consider it the least attractive alternative. Starting from a premise that the capacity of the Wilmington schools must be utilized to the fullest in order to minimize the disproportionate impact on black students, Plan W reassigns children from the predominantly black districts to the predominantly white districts for an average of eight years and reassigns some but not all of the children out of the predominantly white districts for up to seven years. These reassignments are intended to enable accommodation of four full grades of children

in the city, thus minimizing the number of years black children must be reassigned to an average of eight years.[102] Besides minimizing the disproportionate impact on black students with respect to the number of years assigned, Plan W also provides a full range of grades in Wilmington, thus reducing the potential for immediate racial identification of the formerly black schools.

The NCCPBE majority believes the major weakness of Plan W to be that instead of the entire student community, only certain geographic areas actively participate and then for a varying number of years. It is claimed that a plan which fails to reassign children from certain predominantly white districts and reassigns children from other predominantly white districts for as many as seven years [103] will promote bitterness and confusion. Arguably, rather than a likelihood of success, such a plan creates the distinct possibility of resegregation by permitting easy methods by which to withdraw one's participation.

An additional criticism of Plan W is that its complex pairing and clustering arrangement fails to keep students together during the course of their educations to the same degree possible under the majority plan. Groups are splintered at the elementary level [104] and feeder patterns are broken due to the attempt to provide a high school education in Wilmington for any Wilmington child who had been assigned outside that district for nine years.

The plan's method of provision for high school education in Wilmington is also problematic. Anticipated use of the present Wilmington and P.S. duPont High Schools is predicated on a concept of regionalization which does not appear feasible. Drawing a two mile zone around each high school, Plan W's adherents hypothesize that the area would encompass sufficient numbers of white and black students who would be

---

**101.** Fear that whites would not attend or prefer not to attend a formerly black school is an example of an inadequate reason. *Lee v. Macon County*, 448 F.2d 746, 753–54 (5th Cir. 1971).

**102.** The record fails to establish this would actually occur.

**103.** PX 19.

**104.** PX 15; NCCPBE Exh. 20.

within walking distance of the school. Superficially attractive, this attempt to regionalize breaks down when evidence is credited that safety hazards along the two mile route prohibit walk-ins to any significant extent.[105] Furthermore, the two mile circles come within one-half mile of other high schools so that students within actual walking distance of much closer high schools would be assigned to high school in Wilmington.

The foregoing enumerated weaknesses and serious reservations regarding the feasibility of Plan W indicate it should not be afforded further consideration.

 Finally, the Court also has before it the Pupil Assignment Committee's feasibility study which indicates that a 9–3 concept incorporating total student involvement and retention of feeder patterns is possible. Treating all children in the desegregation area equally, the report demonstrates the use of three year consecutive grade reassignments for students living in predominantly white districts, and nine year reassignments for students in the predominantly black districts. In addition to minimizing the disproportionate impact on the aggrieved class, a 9–3 concept provides ready opportunity to offer high school grades 10–12 in Wilmington and/or DeLaWarr, utilizing the available high school facilities in those locations to the extent such use is educationally desirable.

Among the several illustrations generated by the Pupil Assignment Committee, the "G" configuration appears superior. The G illustration retains a tight feeder pattern and provides a full grade span in the predominantly black Wilmington district, thus including use of at least one of the Wilmington high schools as a high school. Under the G illustration, when the Wilmington children are assigned back to the city for three years, they necessarily attend a school close to their homes. This feature, apparently afforded children from predominantly white districts under the 10–2 plan, simply

ought to be preserved as much as possible. The use of geocodes also permits the possible high school use of both Wilmington high schools should the NCCPBE decide such use to be educationally satisfactory. Further, the increased flexibility under G permits easy modification in the future should adjustments be necessary or desirable. Where the educational patterns of thousands of children are involved, a flexible approach is advantageous; G appears to be such a plan.

Apart from the question of capacity, neither the New Board nor defendants State Board and intervening districts have advanced any reasons why a 9–3 concept ought not to be successfully implemented in the desegregation area. Nor has it been shown that if a capacity problem of minor dimension exists, a slight departure from 9–3 is sufficiently deleterious to justify a wholesale embracing of 10–2. Thus the issue before the Court is whether the evidence demonstrates sufficient capacity in Wilmington and DeLaWarr to render feasible a 9–3 plan.

It is important to realize at the outset that unlike the affected areas in other reported desegregation cases Northern New Castle County contains no dearth of school spaces. To the contrary, declining enrollments have resulted in a surplus of seats in all districts such that absent any desegregation order the need to consider closing some schools is abundantly evident.[106] Under the 10–2 assignment plan, severe underutilization of city schools identified the Wilmington schools as ready targets for closing. Under a 9–3 assignment plan, most if not all of the Wilmington and DeLaWarr schools are actively utilized and would probably remain open. In contrast to the devastating impact of the 10–2 plan on the degree of utilization of schools in the predominantly black districts, however, the 9–3 concept contemplates only minor adjustments in the use of the schools in the predominantly white districts, reducing their utili-

---

**105.** Doc. 663M, at 103–05 (Ellis); Doc. 666.

**106.** A further enrollment decline of over 15% is projected for the next five years. Ct.Exh. 109, at 3.

zation from a current figure of 70% to 67%.[107]

Against this background, some have argued that any plan ought to proceed by closing schools first and assigning students to the remaining open schools. Because the paramount goal sought is the vindication of children's rights, the Court's focus is primarily on the effective and equitable assignment of students. Whatever school buildings, if any, ultimately close as a consequence of a particular assignment plan is a matter of secondary importance and one within the purview of the NCCPBE.[108] Despite an express invitation for presentation of applicable testimony, the record does not reveal that one or more schools currently in use cannot or should not continue to be used for any reason. Therefore, the Court must assume that the entire school building capacity of the affected area is available for assignment.

The measurement of actual capacity of school spaces is a matter of considerable disagreement. The Department of Public Instruction has supplied figures of state-rated capacity. These figures were arrived at by multiplying the number of rooms in a school building employed for regular classroom use by thirty children and the number of other rooms by fifteen children. The State then adjusted the total number downward by 10% in secondary schools and 5% in elementary schools. The resulting figure is the state-rated capacity.

Pointing out that this figure fails to account for special education classes, defendants and the NCCPBE contend that the state-rated figures are an inaccurate means of projecting actual capacity. Also, some administrators have testified that adherence to state-rated capacities fails to provide adequate flexibility for desirable programming. In this regard, the Court notes an obvious difference of opinion among administrators concerning what is optimal utilization of a school building.[109]

Plaintiffs also challenge the accuracy of the state-rated figures, contending that one must examine actual buildings, rather than employ a blanket formula. Maintaining that the State formula fails to include considerable usable space within a building such as libraries, gyms, and auditoriums, plaintiffs additionally note that band rooms and choral rooms capable of seating large numbers are counted as non-regular rooms with a capacity of 15 spaces. Relying on the current practice of placing special students in a regular classroom in a method known as "mainstreaming", plaintiffs contend that defendants' proposed adjustments of state-rated capacities for special education students are wildly exaggerated.[110] Finally, plaintiffs assert that defendants' reliance on alleged capacity problems to defeat a 9–3 plan is highly suspect given that under the 10–2 plan, certain predominantly white districts exceed state-rated capacity. Plaintiffs correctly note this excess utiliza-

---

107. PX 26.

108. Should the New Board decide to close some schools, it is understood that in the interests of effective administration the NCCPBE would announce specific pupil assignments only after it had determined which schools would remain open, so that parents and children would not face unnecessary confusion.

109. Dr. Johnson considers 90% of actual capacity to be optimum utilization. Doc. 663H, at 190. He noted that state-rated capacity is presently calculated at 90% of actual. *Id.* 192. Dr. Johnson's testimony was not controverted until the feasibility of 9–3 became increasingly clear. Then Dr. Byrd testified that 80% utilization was the desirable maximum during the initial stages of desegregation. Doc. 695T, at

41. Dr. Pugh testified that in the Alexis I District a 10% downward adjustment of the State formula at the elementary level and a similar 5% adjustment at the high school level provided more accurate data than that obtained by the State method. Doc. 695T, at 59, 62.

110. Special education classes may consist of eight, ten or fifteen pupils depending on whether the class is one for Learning Disorders (LD), Socially, Emotionally Maladjusted (SEM), or Educably Mentally Retarded (EMR). No satisfactory estimate of the impact of these classes on overall capacity is available, given that the State utilized the Learning Disability figure of 8 for all its calculations. *See* D.P.I. Exh. 8, at 3–4.

tion provoked no complaints [111] and many of the districts purported to have provided in the past sound educational experiences in buildings theoretically utilized in excess of capacity.

There is little to suggest that placing three grades in Wilmington and DeLaWarr would result in overutilization of those schools and a great deal to support the argument that three year grade centers are practical. The potential assignments and the resultant utilization figures supplied by the Pupil Assignment Committee in the 9–3 report were devised under severe time constraints. Further, the illustrations do not purport to definitively analyze potential overcrowding problems or suggest that other illustrations resulting in little or no overcrowding could not be delineated. In addition, because of the perceived desirability of retaining the precise attendance areas of the 10–2 proposal, the geographic areas of Wilmington and DeLaWarr are treated as entirely separate entities such that Wilmington serves Areas I, II, and III exclusively and DeLaWarr receives students exclusively from Area IV. Consequently, none of the illustrations attempt to demonstrate what fit is possible if the substantial excess pupil spaces in DeLaWarr are utilized to obviate any resultant capacity problems.

The sample 9-3 assignments result in between eleven and nineteen schools used in excess of 90% of their state-rated capacity.[112] Of these schools, three or four are high schools. Capacity problems at the high school level are generally considered to be far less significant than a similar degree of congestion at the lower levels.[113] At the elementary school level calculations of even the rough figures indicate that, throughout Wilmington, schools housing grades 1–6 would be utilized at between 83.9% and 88.6% capacity and the middle schools serving grades 7–9 at between 89.1% and 98.5%.[114] Any perception of overcrowding is further relieved by the identification of between 1551 and 2207 empty seats in the Wilmington schools, with some 1039–1487 at the elementary level and between 290 and 1003 reserve capacity in grades 7–9.[115]

Thus adjustments of the isolated instances of overcrowding are clearly possible. Indeed the Pupil Assignment Committee anticipates major revisions in placing an actual plan into practice and has suggested that adjusting attendance area lines and geocodes, altering feeder patterns, and making lateral transfers are among the devices that might be used to relieve congestion.[116]

Possibly the best and most direct method of reducing any overcrowding in Wilmington would be to reassign to DeLaWarr some of the children presently assigned to Wilmington. DeLaWarr's five schools have more than adequate capacity to house the three grades presently assigned it under the

---

111. Under the 10–2 plan, seven of the thirteen elementary schools in Attendance Area III exceed 95% of state-rated capacity and five of these schools are projected at 100% or more of state-rated capacity. NCCPBE Exh. 1, at A 31–32. A few isolated schools in the other attendance areas are potentially overcrowded as well. D.P.I. Exh. 9b. In contrast, under the 9–3 G concept, only seven schools exceed 95% of state-rated capacity, with only one primary school (Harlan) exceeding 100% of state-rated capacity. Ct. Exh. 103 (Calculations include adjustments based upon notes within this exhibit.)

112. Ct.Exh. 101A, 101C. Concept G results in the fewest crowded schools.

113. The consensus of opinion is that at the high school level, vocational technical schools, dropouts, and programming, ameliorate overcrowding. *See, e. g.,* Doc. 695R, at 146–47 (Carey).

114. Calculations based on Ct.Exh. 101A, App.; 101B reflect:

| Grades | | Enrollment | Capacity | % Utilization |
|--------|------|-----------|----------|---------------|
| K–6 | S$_1$ | 9349 | 10697 | 87.39 |
| | S$_2$ | 9084 | 10609 | 85.62 |
| | S$_3$ | 7979 | 9509 | 83.90 |
| | G | 11312 | 12768 | 88.59 |
| 7–9 | S$_1$ | 4818 | 5034 | 95.70 |
| | S$_2$ | 4878 | 4950 | 98.54 |
| | S$_3$ | 5545 | 6222 | 89.11 |
| 7–12 | G | 1443 | 1538 | 93.82 |

*See* PX 26.

115. Ct.Exh. 104. Under the G Concept, 2042 Wilmington seats are empty.

116. *E. g.,* Ct.Exh. 101A, at 10–11.

9–3 concepts. Under the three options proposed for Attendance Area IV, the schools in DeLaWarr are utilized only to 58.4–73.5% capacity.[117] Thus in presenting the three options for Attendance Area IV under the 9–3 feasibility study, the Pupil Assignment Committee expressed concern about overcrowding not in DeLaWarr but in the predominantly white sector. Applying the same standard of overcrowding, however, the schools in Area IV identified as overutilized in 9–3 are also potentially crowded under the 10–2 formulation.[118] No litigant, however, objected to the overcrowding in New Castle-Gunning Bedford precipitated by a 10–2 plan. One can only conclude that capacity problems either do not exist or can be corrected.

In any event, it is obvious that to the extent Wilmington is overutilized and De-LaWarr is underutilized, one may adjust for the other. Plaintiffs point out that adding 920 children to the number presently assigned to DeLaWarr under Option 1 would increase DeLaWarr's capacity to merely 80%.[119] Cognizant that the difficult task of pupil assignment involves more than mechanically assigning seats to pupils, the Court declines to suggest or endorse the addition of any particular number. Decisions of this sort are best left to the authorities charged with operating the schools.

Given the clear superiority of the 9–3 concept and all indications that the alleged problem of capacity is capable of resolution, it is concluded that 9–3 is a concept that promises to meet the constitutional goal of effectuating a unitary racially non-discriminatory school system in an effective and equitable manner. The Court will order implementation of a 9–3 plan which utilizes a full grade span in Wilmington. This requirement carries with it the necessity of utilization of at least one of the Wilmington high schools as a 10–12 grade center at a capacity comparable to those of high schools in the predominantly white districts. In implementing a 9–3 pupil assignment concept and managing school affairs, the NCCPBE retains the flexibility to alter attendance area boundaries, modify elementary attendance zone lines, adjust geocodes, employ lateral transfers, break feeder patterns if required, and utilize any other reasonable desegregation tool to achieve what is in its opinion the optimal 9–3 configuration. Although no specific concept is mandated by the Court, it is noted that the G illustration displays the greatest preliminary promise of maintaining feeder patterns while enabling children in the predominantly black districts to attend schools close to their homes during the three years they remain within their districts. Because preservation of NCCPBE flexibility is regarded as of the utmost importance, the New Board's decisions with respect to pupil assignment will not be questioned so long as a 9–3 fit and the few parameters imposed above are met.

One cannot conclude with absolute certainty that the promise of 9–3 will materialize until the NCCPBE, presumably through its Pupil Assignment Committee, has the opportunity to review current enrollment figures, refine its techniques, and exhaust all methods of alleviating capacity problems. If at that time a 9–3 concept utilizing a complete grade span including at least one high school in Wilmington is demonstrated to be unfeasible, the New Board may apply for relief from the pupil assignment component of the Order which will be entered on this Opinion. Relief will be granted upon a showing of good cause.

---

**117.**

| | Enrollment | Capacity | % Utilization |
|---|---|---|---|
| Option 1 | 2524 | 4264 | 59.19 |
| Option 2 | 2491 | 4264 | 58.41 |
| Option 3 | 3134 | 4264 | 73.49 |

*See* Ct.Exh. 101A, App.; 101B.

**118.** Under the 10–2 plan, the William Penn High School is utilized at 99.74%, George Read Middle School at 88.27%, New Castle Middle at 96.01%, and Gunning Bedford Middle at 88%. NCCPBE Exh. 1, at A 43, 47.

**119.** Adding 920 to numbers set out at n. 117 *supra,* p. 1008 would actually render the per-

### E. "But For" and The Inter-district Remedy

The court has reviewed and analyzed all proposals fully cognizant that the New Board (10–2) configuration, the minority report (Plan W), and the concepts proffered by the Pupil Assignment Committee pursuant to Court direction (9–3) were formulated without exacting consideration of whether they returned the Northern New Castle County schools to the precise position they would have assumed "but for" the found constitutional violations. Defendants allege that these proposals are therefore violative of *Dayton Board of Education v. Brinkman,* 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977).[120]

In the first place, defendants "but for" argument is a belated attempt to relitigate an issue already conclusively resolved in this case, with all right of appeal exhausted. Following two extensive hearings on violation and remedial plans, the three-judge court applied controlling legal standards to this case. In the first two opinions, the three-judge court found *inter alia* comprehensive *de jure* segregative actions with inter-district effects under *Milliken I, supra.* 379 F.Supp. at 1220, 1222–24; 393 F.Supp. at 432–38, 445, 447. These findings were summarily affirmed by the Supreme Court. 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975). In a third opinion, following evidentiary hearings on various plans submitted by the parties, the three-judge court clarified its duty in the context of prescribing an inter-district framework for the transition to racially nondiscriminatory education: "Our duty is to order a remedy which will place the victims of the violation in substantially the position which they would have occupied had the violation not occurred." 416 F.Supp. at 341 (footnote omitted). In satisfying its duty, the three-judge court relied primarily upon *Milliken I* and *Swann, supra,* and made the detailed findings of fact and reasoned statement of law later explicitly required by *Dayton.*

The Third Circuit modified this opinion not with respect to scope or extent of remedy but only to assure that no particular racial quota be imposed in eliminating the constitutional violations. 555 F.2d 373 (3d Cir.), *cert. denied,* 434 U.S. 880, 98 S.Ct. 235, 54 L.Ed.2d 160 (1977). Specifically, in affirming the three-judge court remedy order the majority of the Third Circuit en banc panel rejected the dissent's view that:

> "[A] remand to the district court is also required so that the district court can determine as precisely as possible what the racial composition of the schools of northern New Castle County would now be if those interdistrict violations found to be valid had not taken place. To put it another way, the district court should determine to what extent the present racial makeup of the affected schools is attributable to acts which violated the Equal Protection Clause and to what extent it is attributable to economic and social forces, to private actions, and to nondiscriminatory governmental actions. After the district court has made that determination, it could then require the parties to submit plans designed to remedy the effects of the constitutional violations."

555 F.2d at 390 (dissenting opinion). Thus the "but for" issue asserted by defendants is controlled by the law of the case,[121] and all right of appeal on this issue has been exhausted.[122] The limited task remaining for this Court is to assure the implementation of an assignment pattern that complies

---

centage of utilization anywhere from 79.9–95%.

**120.** Doc. 669, 694 (Intervening Defendants); Doc. 670 (Defendant State Board of Education). On this and most other issues, defendant DeLaWarr District is not aligned with the majority of Intervening Defendants.

**121.** *See Insurance Group Comm. v. Denver & Rio Grande W.R.R.,* 329 U.S. 607, 612, 67 S.Ct. 583, 91 L.Ed. 547 (1947); 1B *Moore's Federal Practice* ¶ 0.404[1].

**122.** This is not the first time during the course of this suit that defendants have sought to relitigate an issue in contravention of the law of the case principle. *See* 555 F.2d at 378.

with the remedy opinion issued by the three-judge court as modified by the Third Circuit.[123]

An analogous attempt to relitigate a previously resolved issue transpired in the Boston school desegregation episode, *Morgan v. Kerrigan, supra.* The First Circuit squarely rejected the notion that at the remedial stage a court should decide anew issues definitively adjudicated in earlier phases of a case:

> "The Association, in effect, argues that the trial on liability should be treated as the first of two battles, and that the second battle should involve a more particularized inquiry into the causes of the segregation at the individual schools within the system. . . . This second battle would be considerably more complicated than the first. . . . The district court could be faced with the task of making percentage findings as to every school in the district.
>
> "The short answer to the Association is that its position is squarely contrary to the remedial principles of *Swann, Davis,* and *Green.*"

530 F.2d at 416 (footnote omitted). In a similar vein, this Court concludes that the battle defendants seek to wage already has been fought; the time has arrived for all parties to seek to cure the constitutional infirmity rather than prolong the illness.

Second, the *Dayton* decision is factually distinct from the case at bar and therefore not dispositive. In *Dayton,* the district judge found three "relatively isolated", 97 S.Ct. at 2772, violations that could be deemed "of questionable validity". *Id.* Confronted with this limited record, the United States Court of Appeals for the Sixth Circuit twice reversed orders of the district judge designed to cure the perceived infirmities. The circuit court "engaged in no fact finding of its own based on evidence adduced before the District Court", *Id.* at 2773, but nonetheless "apparently" imposed a "systemwide remedy". *Id.* at 2774. Accordingly, the district court judge, after two reversals, was compelled to order a broad remedy "entirely out of proportion to the constitutional violations found by the District Court, taking those findings of violations in the light most favorable to respondents." *Id.*

Thus not only is *Dayton* distinguishable from the instant case by virtue of the extent and scope of the violations that have been definitely determined in *Evans* as compared to *Dayton,*[124] but *Evans* contains no history of extensive and improper circuit court interference not based on the record evidence. That this latter aspect was the fulcrum for *Dayton* was explicitly articulated in the concurring opinion of Justice Brennan:

---

**123.** Concerning defendants' request for a further inquiry with respect to discriminatory intent and "incremental segregative effect", *see Dayton, supra,* 97 S.Ct. at 2775, this Court restates its prior holding that "the three-judge court made all the subsidiary findings . . . that the record permits without resort to sheer speculation." Also, defendant State Board of Education has asserted the "position that it is not 'feasible' to determine what the affected school districts and school populations would be today 'but for' the constitutional violations found by the three-judge court and affirmed on appeal." Doc. 548. The NCCPBE apparently has agreed that such an inquiry would not be feasible. *See, e. g.,* Doc. 663C, at 3–11 (Kirk).

With regard to the claim that *Dayton* established a "new" concept, Doc. 694, at 2, it is specifically noted that the Supreme Court in *Dayton* did not purport to establish a novel constitutional standard. *See* 97 S.Ct. at 2776 (Brennan, J., concurring): "The Court today

reaffirms the authority of the federal courts 'to grant appropriate relief of this sort [i. e., busing] when constitutional violations on the part of school officials are proven.' " Moreover, the concept of segregative intent was articulated at least as early as *Keyes v. School Dist. No. 1,* 413 U.S. 189, 208, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973).

**124.** *Brennan v. Armstrong,* 433 U.S. 672, 97 S.Ct. 2907, 53 L.Ed.2d 1044 (1977), and *School Dist. of Omaha v. United States,* 433 U.S. 667, 97 S.Ct. 2905, 53 L.Ed.2d 1039 (1977), per curiam decisions rendered the same day as *Dayton,* comport with this conclusion. Both those cases were remanded to the district court for reconsideration in light of *Dayton* and *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). The significant factual difference in *Evans v. Buchanan* is that a systemwide violation requiring an inter-district remedy has already been definitively determined.

"This case thus does not turn upon any doubt of power in the federal courts to remedy state-imposed segregation. Rather, as the Court points out, it turns upon the 'proper allocation of functions between the district courts and the courts of appeals within the federal judicial system.' "

97 S.Ct. at 2776 (concurring opinion).

Third, the firmly established constitutional violations in this case are the perpetuation of a dual school system and the vestige effects of pervasive *de jure* inter-district segregation. *Evans v. Buchanan,* 416 F.Supp. at 343; 393 F.Supp. at 432–38, 445, 447. *Dayton* reaffirms that "[o]nce a constitutional violation is found, a federal court is required to tailor 'the scope of the remedy' to fit 'the nature and extent of the constitutional violation.' " 97 S.Ct. at 2775; *see Milliken I,* 418 U.S. at 744, 94 S.Ct. 3112; *Swann,* 402 U.S. at 16, 91 S.Ct. 1267. Eradication of the constitutional violation to the scope and extent enumerated by the three-judge court is all that any of the plans and concepts submitted purport to accomplish,[125] and that is all the concept endorsed by the Court does accomplish.

This is not a case of the lower court failing to perform its fact-finding task, the circuit court arbitrarily substituting its judgment for the lower court, or the judicial process running astray. The ineluctable conclusion is that the time has passed for the argument defendants urge upon the Court. Defendants may find the law of the case distressing, but they cannot obviate its finality.

F. *Congressional Enactment*

Statutory priorities for assignment and transportation of public school students are codified in the Equal Educational Opportunities and Transportation of Students Act of 1974, 20 U.S.C. §§ 1701 *et seq.*[126] As a starting point, the three-judge court fashioned all the findings concerning the need for widespread alteration of district lines that are required by sections 1715 and 1756 of the Act. 416 F.Supp. at 361–64.

■ Realizing the existence of an inter-district constitutional violation has been definitively resolved in this case, the Court finds that an adequate remedy necessitates some mandatory transportation of students. 20 U.S.C. § 1755; *see Morgan v. Kerrigan, supra,* 401 F.Supp. at 263–64; 530 F.2d at 412–15. The Court finds that the specific priorities enumerated in section 1713 are inadequate to achieve substantial desegregation in the schools of Northern New Castle County. Subsections (a) and (b) of section 1713 require assignment of students, considering only school capacity, natural barriers or both, to the schools nearest their residences that provide appropriate grade levels and types of education. Application of these provisions is not feasible because of geography and racial distribution within the affected area.[127] Priority (c), permitting majority to minority transfers, was considered and rejected as an alternative by the three-judge court. 416 F.Supp. at 344–46. Additionally, a variant transfer policy, dubbed "reverse volunteerism" by its proponents, was evaluated and rejected by this

---

**125.** The Pupil Assignment Committee 9–3 concepts were designed pursuant to Court request, as alternate means of curing the condition offensive to the Constitution. The intent of the drafters of the New Board 10–2 Plan was signified by that document's title: "Report of the New Castle County Planning Board of Education Upon Its Plan For Operation of a Unitary School System." NCCPBE Exh. 1. The intent of the minority Plan W report was displayed in a letter by its principal sponsor that was inserted within the report. "In my opinion, this plan meets the Order of the Court and remedies the inter-district violation of unconstitutional segregation of New Castle County Schools." PX 15, Prefatory Letter at 1.

**126.** Act of August 21, 1974, 88 Stat. 514, 20 U.S.C. §§ 1701 *et seq.*

**127.** The determination of an inter-district violation effectively foreclosed these alternatives. The black student population of the area is heavily clustered within the Wilmington and DeLaWarr Districts. *See* D.P.I. Exh. 4. Given this distribution and the extent of the affected desegregation area, substantial adherence to the priorities of section 1713(a), (b) could not be accomplished within the context of an effective desegregation decree.

Court.[128] Priority (d), utilization of attendance zones and/or grade structures to limit transportation except to the nearest school is, to the extremely limited extent feasible, a planning device appropriate to the pupil assignment concept endorsed by the Court.[129] Priority (e), construction of new schools and/or closing of "inferior" schools, is not a practical method of reducing transportation and is therefore rejected as a potential means to accomplish desegregation in Northern New Castle County. First, because the affected area has a surplus of schools, scant, and probably no, new construction is foreseeable. Second, although the meaning of the term "inferior"[130] schools is nebulous, application of the criteria in this instance might result in the closing of schools in the predominantly black core area. Such closings would compel mandatory transportation of black students to an extent even beyond that presently contemplated, and would potentially impede the already limited applicability of the preferred priority (d). Priority (f), use of magnet schools, was considered and rejected by the three-judge court. 416 F.Supp. at 345–46.

Because Congress explicitly stated that it did not intend to circumscribe the powers of the courts to enforce the fifth and fourteenth amendments,[131] the priorities of section 1713 are not conclusive. Accordingly, the Court finds that some transportation of students to schools other than those next closest to their residences is required to eliminate the dual school system and the vestige effects of *de jure* segregation in Northern New Castle County. *See* 20 U.S.C. §§ 1714(a), 1718. No showing has been made that required transportation poses a risk to the health of students or significantly impinges on the educational process of students.[132] *See* 20 U.S.C. § 1714(b); *compare Morgan v. Kerrigan,* 401 F.Supp. at 264.

### G. *Additional Pupil Assignment Matters*

#### 1. *Rising Seniors*

The term "rising seniors" has been employed in this case to refer to those students who will be high school seniors in the year in which the desegregation plan goes into effect. The three-judge court ruled that "rising seniors will not be required to be reassigned". 416 F.Supp. at 360. In recent hearings, substantial sentiment was expressed that rising seniors should be included within rather than exempted from

128. 435 F.Supp. at 838–41. The proposal was rejected for "procedural, equitable, and substantive reasons". *Id.* at 841. With regard to substance, the Court expressed its considerable doubt that the proposal would accomplish desegregation at any time, but particularly that it could desegregate *now. See Green v. County School Board, supra,* 391 U.S. at 439, 88 S.Ct. 1689.

129. The geography and racial composition of the affected area, however, with a central predominantly black core and a dispersed suburban predominantly white population, vitiate widespread application of this priority.

130. The district court in *Morgan v. Kerrigan, supra,* apparently defined "inferior" as "old". 401 F.Supp. at 264. Applying this definition, the majority of the "inferior" schools in the affected area are in the predominantly black Wilmington District. *See* D.P.I. Exh. 10. Despite the Court expressly inviting the parties to present such testimony, however, the record does not indicate that any schools in the Wilmington District are unsuitable for effective

use in public education. *See. e. g.,* Doc. 663S at 150, 204–05 (Ellis); Doc. 663T at 105 (Dineen).

131. 20 U.S.C. § 1702(b); *see Morgan v. Kerrigan,* 530 F.2d at 412–13; *Evans v. Buchanan,* 416 F.Supp. at 362.

132. Although the extent of mandatory transportation that will be required is indeterminate, the Court notes that a previous submission in this case revealed that about half of the students in the affected area are bussed to school each day. Doc. 333, at 42. This percentage now is probably low; as a not atypical example, the superintendent of the largest of the eleven present districts testified during recent hearings that within his district approximately 11,000 out of 17,000 students are transported to school by bus. Doc. 663C, at 114 (Kirk). This high rate of bussing is a result of geography and State safety regulations. *See, e. g.,* Doc. 663M, at 101–02 (Ellis).

any desegregation order.[133] The Court desires to afford maximum flexibility and discretion to local authorities and thus reaffirms that reassignment of rising seniors will not be mandated. Whether to include rising seniors in pupil reassignment is an educational determination properly made by the NCCPBE.

### 2. Kindergarten

The three-judge court also did not require the reassignment of kindergarten children. 416 F.Supp. at 360–61. The Court, noting that this is another issue properly within the province of the New Board, reaffirms the decision that reassignment of kindergarten students is not mandatory.

### 3. Special Schools

A number of schools within the desegregation area serve the orthopedically handicapped, the audially handicapped, and students otherwise eligible for special programs. The three-judge court declined to change the location or manner of operation of these schools. 416 F.Supp. at 360. The Court adheres to the three-judge court determination that these schools need not be included within the desegregation decree and vests control over them in the New Board.

### 4. Vocational Technical Schools

The operation and supervision of vocational technical schools within the affected area were regarded by the three-judge court as matters "left to the discretion of state authorities" "[a]bsent a showing that the present method offends constitutional guarantees". 416 F.Supp. at 361. The three-judge court specifically exempted the DelCastle Center from inclusion within the desegregation decree, 416 F.Supp. at 361, and the Court continues that exemption. With regard to the other vocational technical schools, the Howard Career Center and Hodgson Vo-Tech, the NCCPBE has requested a one year exemption of these schools from the desegregation order. The Court grants the requested exemption, believing it appropriate under the circumstances of this case.

### 5. Voluntary Transfer Students

As previously recited,[134] Delaware law required that in 1977–78 all districts accept students whose race was under-represented at a particular school and who wished to transfer to that school and some students accepted this voluntary transfer opportunity.[135] The overwhelming sentiment of the parties to this litigation is that upon implementation of a desegregation scheme those voluntary transfer students be treated as are all other students and not

**133.** The NCCPBE has requested that it be afforded the power to include rising seniors within the eventual reassignment scheme. Doc. 672, at 9. The Chief Administrator and Executive Secretary of the New Board indicated that a plan "would be more convenient to put into operation if the rising senior [exemption] section were taken out," but that he doesn't "have any strong preferences" on the question. Doc. 663D, at 207–08 (Kirk).

Plaintiffs adopted the consistent position that they favored including rising seniors within any desegregation plan. Doc. 663D, at 242–44.

The State Board of Education initially espoused the position that the "rising senior exception is a bad idea generally", Doc. 663D, at 246, but that the State's position "may be" contingent on the plan favored by the Court. Doc. 663D, at 251; see Id. 244–51. At a later point, the State Board averred that rising seniors should be included within any of the proposed schemes. Doc. 695P, at 53.

The majority of intervening defendants waivered on the issue depending upon whether a particular plan or concept utilized the high school(s) within their districts as high school(s) or lower grade centers. So long as all high schools within a given district were employed as high schools, that district generally favored removal of any exemption previously afforded rising seniors. If a plan or concept entailed the potential for converting a high school within a district into a lower grade center, that district generally favored excluding rising seniors from desegregation. See, e. g., Doc. 695T, at 184 (Alexis I.); id. 192 (Claymont and Stanton); id. 193 (Conrad); Doc. 695P, at 55 (Marshallton-McKean); id. 61 (DeLaWarr).

**134.** See n. 92 supra, p. 1000.

**135.** See n. 93 supra, p. 1001.

afforded an exemption to continue their educations at the schools at which they voluntarily transferred. Although sympathetic to the plight of the voluntary transfer students, the Court determines that for administrative reasons the transfer students must not be afforded an exemption. If at all feasible, assuring that the voluntary transfer students remain at their 1977–78 schools while at the same time implementing a desegregation scheme involving all other students would be an imposing administrative task for the NCCPBE. With this in mind, and noting that the relevant State law was expressly made operative only for the 1977–78 school year, the voluntary transfer students will not be exempted from the desegregation scheme implemented by the NCCPBE.

### 6. *Hispanic Students*

Treatment of Hispanic students is not discussed because agreement was achieved between the interested parties during the course of this litigation.[136]

### II. *ANCILLARY REMEDIAL RELIEF*

The question whether federal courts can order remedial education programs as part of a school desegregation decree was answered affirmatively in *Milliken II, supra*, which provides that such remedial relief may be appropriate commensurate with guiding "equitable principles." 97 S.Ct. at 2757.[137] *See Brown II, supra.* The remedy must be related to the constitutionally of-

fensive condition, designed "as nearly as possible 'to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct,' "[138] and fashioned in accordance with the legitimate interests of state and local authorities in self-management. *Milliken II*, 97 S.Ct. at 2757.

The NCCPBE and plaintiffs have requested ancillary remedial relief by including such programs within their proposed orders.[139] Additionally, intervening defendants have orally represented that such relief is appropriate for inclusion within a final order.[140] The State defendants disagree, presumably because in the absence of an ancillary relief order, the single district would be required to bear the entire cost of such remedial programs from local funds.

■ In objecting to imposition of ancillary remedial relief, the State Board contends that the New Board can implement such programs to the extent it believes necessary, but that a judicial order concerning ancillary relief is improper absent a showing that each aspect of the necessary remedial relief is presently "infected" with discriminatory bias.[141] That ancillary remedial relief is necessary and essential to accomplish the transition to unitary racially nondiscriminatory schooling and to overcome the vestige effects of *de jure* segregation in Northern New Castle County is amply supported and indeed undisputed on the record.[142]

---

136. NCCPBE Exh. 1A; *see* Doc. 649; Doc. 695M, at 54.

137. The Supreme Court noted that it had previously affirmed a lower court order that included a remedial relief requirement in the form of in-service training programs in *Swann,, supra*, 97 S.Ct. at 2756–57 n. 13.

138. The quoted portion is from *Milliken I, supra*, 418 U.S. at 746, 94 S.Ct. at 3128.

139. Doc. 696; 664.
 *Compare Milliken II*, 97 S.Ct. at 2758: "[T]he Detroit School Board itself proposed incorporation of these programs in the first place."

140. Doc. 695 U, at 64–81.

141. Doc. 670, at 5. The State Board declares:

"To the extent that the New Board believes the programs to be educationally desirable, it can implement them to the extent it feels they are necessary for whatever time it feels they are necessary without the constraint of a judicial mandate." *Id.* 6.

142. *E. g.*, PX 6B, App. B, at 32: "[N]o desegregation plan can truly be effective without an education component and other ancillary relief necessary to assure a transition to non-discriminatory schooling, to begin to overcome the effects of the segregation violation and to prevent resegregation and to bar like discrimination in the future." PX 6B was written under the supervision of Dr. Joseph E. Johnson, Superintendent of Schools, Wilmington District. Doc. 663 I, at 16. Dr. Johnson orally stated that PX 6B in its entirety represents what is "necessary" for an effective plan. *Id.*

Stripped to its essentials, the argument of the State Board of Education is that raised by the state defendants in *Milliken II* and rejected by the Supreme Court:

"Invoking our holding in *Milliken I, supra*, petitioners claim that, since the constitutional violation found by the District Court was the unlawful segregation of students on the basis of race, the court's decree must be limited to remedying unlawful pupil assignments. This contention misconceives the principle . . . and we reject their argument."

97 S.Ct. at 2758.

The Court further stated:

"*Montgomery County* therefore stands firmly for the proposition that matters other than pupil assignment must on occasion be addressed by federal courts to eliminate the effects of prior segregation.

. . . . .

"In light of the mandate of *Brown I* and *Brown II*, federal courts have, over the years, often required the inclusion of remedial programs in desegregation plans to overcome the inequalities inherent in dual school systems.

. . . . .

"Pupil assignment alone does not automatically remedy the impact of previous, unlawful educational isolation; the consequences linger and can be dealt with only by independent measures.

97 S.Ct. at 2758, 2759, 2761.[143]

Applying the standards of *Milliken II*, and after a thorough, independent review of the evidence, the Court determines that in this case the forms of ancillary remedial relief particularized below are necessary and essential to overcome the dual school

system and the vestige effects of *de jure* segregation and to assure an effective transition to a racially nondiscriminatory unitary school system. In mandating this relief, the substantial authority of state and local officials in managing educational affairs is recognized by according ample latitude to the NCCPBE. The precise development and actual implementation of remedial relief is left to the discretion of educational authorities. On this record, however, the Court is compelled to delineate certain general guidelines for ancillary relief required to redress the continuing constitutional violation.

First, the Court finds that in-service training is essential. Administrators, faculty, and other staff require orientation and training for desegregation. *See, e. g.,* PX 6B, App. B, at 32; Doc. 596 C, at 725–28A (Foster); Doc. 663 C, at 203–04 (Kirk); Doc. 663 I, at 16 (Johnson). *Compare Milliken II*, 97 S.Ct. at 2755–56. Therefore, the New Board will be directed to formulate and implement a comprehensive in-service training program for teachers, administrators, and other staff.

Second, reading and communication skills merit particular attention. "[S]peech habits acquired in a segregated system do not banish simply by moving the child to a desegregated school. The root condition shown by this record must be treated directly by special training at the hands of teachers prepared for that task." *Milliken II*, 97 S.Ct. at 2761. *See, e. g.,* PX 6B, App. B, at 32–33; Doc. 596 C, at 785–86 (Foster); Doc. 663 C, at 204–06 (Kirk); Doc. 663 I, at 16 (Johnson). In order to remedy the effects of past discrimination, the New Board will be directed to institute an affirmative

---

Dr. George V. Kirk, Superintendent of Schools, Newark School District, and Chief Administrative and Executive Secretary, NCCPBE, indicated that the components in PX 6B "are the kind of items that I think the Board of Education which is going to deal with desegregation has to deal with . . . ." Doc. 663 C, at 202; *see id.* 231; Doc. 663 D, at 7.

Describing the importance of ancillary relief programs to the desegregation experience in

Hillsborough County (Tampa) Florida, Dr. Raymond O. Shelton, Superintendent of Schools in Hillsborough County, stated: "Well, they saved our life, we said, as far as having staff and people to work with young people." Doc. 663 B, at 88.

**143.** The initial reference is to *United States v. Montgomery County Board of Education*, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969).

reading and communication skills program which does not resegregate pupils.[144]

Third, curriculum offerings and programs must preserve respect for the racial and ethnic backgrounds of all students. To that end, instructional materials, texts, and other curriculum aids should be free of racial bias. Therefore, the NCCPBE shall provide curriculum offerings and programs which emphasize and reflect the cultural pluralism of the students, and all instructional materials, texts, and other curriculum aids shall be free of racial bias.[145] *See, e. g.,* PX 6B, App. B, at 33–34; Doc. 663 C, at 206; Doc. 663 E, at 89 (Kirk); Doc. 663 I, at 16 (Johnson).

Fourth, to ameliorate the racial pressures on students undergoing desegregation and to prevent resegregation under the guise of curriculum or program choices, the NCCPBE must institute an effective and nondiscriminatory counseling and guidance program. This counseling and guidance program must insure that students are counseled on a racially nondiscriminatory basis concerning programs available in the area of work opportunities and opportunities for a college education; and that students who choose vocational and other special public schools in the area do so on a nondiscriminatory basis. *See, e. g.,* PX 6B, App. B, at 34; Doc. 596 C, at 786 (Foster); Doc. 663 C, at 206–07 (Kirk); Doc. 663 I, at

16 (Johnson). *Compare Milliken II,* 97 S.Ct. at 2755–56.

■ Fifth, selection of school sites, construction of new buildings, expansion of existing facilities, and closing of school buildings obviously have an important bearing on the future status of desegregation in this area.[146] *See Swann, supra,* 402 U.S. at 20–21, 91 S.Ct. 1267. The New Board must establish and enforce nondiscriminatory guidelines for new construction, review of building needs, and the appropriateness of each proposed building project or school closing.[147] *See, e. g.,* PX 6B, App. B, at 34; Doc. 663 C, at 207 (Kirk); Doc. 663 I, at 16 (Johnson).

Sixth, it is necessary for the New Board to provide an appropriate human relations program throughout the unitary school system in order to protect the individual dignity of students and teachers and to prevent racial myths and stereotypes from prevailing in schools undergoing desegregation. *See, e. g.,* PX 6B, App. B, at 38; Doc. 663 C, at 207–08 (Kirk); Doc. 663 B, at 21–25 (Shelton).

Seventh, at the point of desegregation, particular concern for non-arbitrary and nondiscriminatory discipline is essential. The NCCPBE shall be directed to develop a code of rights and responsibilities regarding

**144.** Plaintiffs have requested inclusion of a provision that any reading and communications skills program not "reassign or otherwise demote pupils, in order to remedy the effects of the past discrimination." Doc. 664, at 16. There has been no demonstration the New Board would not make all efforts to avoid stigmatization of the victims of the constitutional violation. Accordingly, plaintiffs' request is denied.

**145.** Plaintiffs have requested the Court to order that: "All testing and other educational assessments and pupil educational classifications shall be free of racial or other cultural bias." Doc. 664, at 16–17. Although an analogous provision was upheld in *Milliken II,* 97 S.Ct. at 2755, 2760, and is undoubtedly within a court's power to order in appropriate circumstances, there is no reason to assume on the present record that the NCCPBE would knowingly in-

troduce or permit an element of racial or cultural bias in pupil testing, educational assessment, or classification. Plaintiffs' request is denied.

**146.** The Court has already ruled that formulation of a pupil assignment scheme must precede decisions on school closings. *See* text *supra* at 1006.

**147.** Plaintiffs have urged inclusion of language requiring the New Board to "seek to equalize school facilities, prevent resegregation in the desegregation area, and minimize the disproportionate reassignment burden born by black students." Doc. 664, at 17. Ordering such language is not warranted under the circumstances of this case. Plaintiffs' request thus is denied.

such issues as student conduct and suspension and expulsion, and to insure administration of the code in an unbiased manner. The New Board shall assure procedural and substantive safeguards as required by existing law. *See, e. g.,* PX 6B, App. B, at 38–39; Doc. 663 C, at 208–09 (Kirk); Doc. 663 B, at 26–27 (Shelton).

Eighth, in this case, independent of student assignment, the additional record [148] made at hearings conducted after issuance of the primary remedial decree demonstrates that racial identity of schools can be perceived solely by reference to the racial composition of staff and existing staffs manifest substantial disparity in racial make-up. *See, e. g.,* PX 18; *compare Swann,* 402 U.S. at 18, 91 S.Ct. 1267. The New Board must reassign faculty, administrative, and other staff personnel in the course of eliminating the dual school system and the vestige effects of inter-district *de jure* segregation in order to insure that schools do not retain their former racial identity through racially identifiable faculty and staff assignments.[149] *See, e. g.,* PX 6B, App. B, at 39–41; Doc. 663 C, at 139, 154–61, 209–31 (Kirk); Doc. 663 H, at 208–16; Doc 663 I, at 4–5 (Johnson).

Care has been taken to assure that all components of ancillary remedial relief that will be ordered are supported on the record as vital and essential to an effective desegregation plan. Conversely, where record support is deficient, the requests have been denied. Those measures granted are necessary to cure the constitutional infirmity and restore the victims of discrimination as nearly as possible to the position they would have assumed in the absence of a violation.

## III. *GOVERNANCE*

The word "governance" was initially employed in this litigation to "define who will be charged with the operation of the [racially nondiscriminatory unitary school] system on a day-to-day basis." [150] Governance has now taken on a secondary meaning, namely, identifying and resolving problems inherent in the transition from eleven school districts to a single district. Some of these problems stem from the refusal of the State Legislature to provide either a governance scheme or a statutory framework appropriate for the operation of one district.[151] As a consequence, this statutory deficiency must be repaired by the device of following Delaware law where applicable and modifying it where necessary.

In so doing, the Court, guided by the equitable principles of *Brown II, supra,* is acutely aware that broad flexibility is required by the NCCPBE in administering the schools and that a judicial decree must not "significantly impinge on the educational process." *Swann, supra,* 402 U.S. at 30–31, 91 S.Ct. at 1282. At the same time, the

---

148. The three-judge court previously noted: "We have no figures in the record to indicate whether there is a substantial disparity in racial makeup of existing staffs." 416 F.Supp. at 359.

149. Plaintiffs have suggested inclusion of two additional provisions, one requiring review of past hiring and promotion policies of the existing districts and appropriate actions to overcome the continuing effects of any past discrimination, and the other prohibiting any decrease in the percentage of minority employees at any level of responsibility during the transition to a racially non-discriminatory system. Doc. 664, at 18–19. The record does not warrant imposition of the additional requested relief. Plaintiffs' request is denied.

150. *Evans v. Buchanan,* 416 F.Supp. at 357; *see Evans v. Buchanan,* 555 F.2d at 380–81.

151. Judicial notice is taken that the Governor of the State of Delaware convened the Delaware General Assembly in special session on December 16, 1977, to attempt to pass governance legislation. Although a governance scheme must be designed so that it avoids frustrating a pupil assignment plan, no effort was made to even consider a pupil assignment plan. Furthermore, the legislature adjourned without enacting legislation going to the limited issue of governance. No opinion is expressed concerning whether such action would have been timely.

Court recognizes that if the cost of public education to the local taxpayer becomes unrealistically high, the entire desegregation effort could totter and ultimately crumble under the heavy financial weight associated with it. Although not directly caused by desegregation, increasing taxes resulting from a uniform tax rate throughout the desegregation area are likely to be perceived as a consequence of desegregation even though the cost of desegregation itself is relatively minimal.

In addition to statutory deficiencies, the other governance problems fall into two broad categories: (A) the method and timing for converting the governance body from an appointed unit to an elective body; and (B) the costs of operating the single district and the allocation of those costs.

### A. *Transition to An Elective Body*

In formulating its proposed governance scheme, the three-judge court attempted to parallel Delaware law as reflected in the Educational Advancement Act, 14 *Del.C.* §§ 1001 *et seq.* Accordingly, a five person board was appointed in conformance with statutory reorganization provisions. *See* 14 *Del.C.* § 1065. "[T]o provide some geographical range and population equality," the three-judge court stipulated that one member of the governing board "shall be appointed from the present Wilmington Board; one from the Newark Board; one from either the New Castle-Gunning Bedford, DeLaWarr or Conrad Boards; one from Stanton, Marshallton-McKean or Alexis I. DuPont; and one from Alfred I. DuPont, Mount Pleasant, or Claymont." 416 F.Supp. at 358.

The NCCPBE has recommended that this scheme of representation be carried forward for the unitary district.[152] Because, however, the suggested composition is predicated upon retention of districts that will

cease to exist upon operation as a unitary district, the Court declines to affix its imprimatur to such a formulation. Rather, incorporating to the extent feasible provisions of State law and the desires of the NCCPBE, the Court approves the following framework for the transitional governance of the unitary district.

 Governance of the reorganized desegregation area will continue to be performed by the presently constituted NCCPBE until June 30, 1978. Thereafter, the presently constituted NCCPBE will become the New Castle County Board of Education (NCCBE) with the individual membership serving until June, 1980. The Court believes it necessary to adopt such a procedure in order to assure continuity and guarantee that the NCCBE will have the opportunity to function as a cohesive governance unit to assess strengths, bolster weaknesses, and resolve problems as the desegregation process continues to unfold. Further counterbalancing the obvious desirability of rapid return to an elected board is the prospect of a bitter and divisive election in the latter part of the first school year of desegregation. Because the composition of the governance unit will not change during the period, the unitary district shall not conduct the election outlined in 14 *Del.C.* § 1045(b) in 1978 or 1979.

Commencing in 1980, the procedure that shall be employed is as follows. The State Board of Education shall by lot determine the initial terms of office of the present members of the NCCPBE, causing one member's term to expire in June of 1980 and one of the remaining terms to expire in each of the four succeeding years, respectively. One member of the five person school board thus shall be elected each year. *See* 14 *Del.C.* § 1052(c). The school board that will result upon completion of a five year cycle shall be composed of one representative from the City of Wilmington

---

**152.** Doc. 696, at 5–6.

proper and four members each representing attendance areas in the pupil reassignment arrangement adopted by the NCCPBE.[153] The State Board of Education shall assure that each outgoing member is succeeded by a member from the attendance area conforming geographically as closely as possible [154] to the area represented by the outgoing member.[155] Each representative shall serve a five year term. *See* 14 *Del.C.* § 1052(d). Each member shall be a citizen of Delaware and resident of the area in which elected [156] and shall be qualified to vote at a school election of the unitary district at the time of such election. *See* 14 *Del.C.* § 1052(b). This election scheme shall continue at least until 1985.

The Court is aware of the possibility during the transition period for dual represen-

tation, lack of geographic representation, and imperfect representation.[157] These considerations are outweighed, however, by the benefits of the mandated scheme. First, the decision to require an elected school board conforms to the procedure presently employed by nine of the eleven component districts.[158] Second, the overall procedure is based not upon district lines that will cease to exist, but rather upon functionally determined attendance zones. Third, the procedure comports in general terms with State law. *See, e. g.,* 14 *Del.C.* §§ 1051 *et seq.* Fourth, the procedure assures continuing representation of plaintiffs' rights by including a school board slot for a resident of the City of Wilmington.

Assuring a representative from Wilmington proper enables the Court to decline a

---

**153.** Virtually without exception, the 9–3 pupil assignment concepts proffered utilize four attendance areas. Accordingly, the Court assumes that the NCCPBE will implement a formulation containing four attendance zones. It is stressed, however, that the Court does not mandate use of four zones, does not wish to dictate attendance area boundaries, and does not desire to circumscribe NCCPBE flexibility in this regard. If the NCCPBE should adopt a final pupil assignment scheme that does not employ four zones, it is directed to make a formal motion for adjustment of the defined election procedure.

**154.** The Court recognizes that the attendance areas will not specifically conform to the geographic district alignments utilized by the three-judge court. The State Board must only make a reasonable effort to replace a given geographic district alignment with a representative from the appropriate attendance area, assuring in any event that by 1985 each of the four attendance areas will be represented.

**155.** For voting purposes, the attendance zones are those to be adopted by the NCCPBE excluding those portions of Wilmington proper within the zones. This exclusion is necessary to assure that all areas are fairly represented and that Wilmington, which independently is afforded a member, does not receive undue representation.

**156.** Thus each representative of an attendance area must reside within that area. Similarly, each Wilmington representative must reside within the City of Wilmington proper.

**157.** Dual representation and lack of geographic representation could result for a limited time because the attendance area that for election purposes will replace the geographic district boundaries differs in configuration from the former district boundaries. Thus, a given geographic area temporarily may have two, or zero, representatives on the NCCPBE. The Court perceives no great harm should this eventuate because the geographic areas in question have demonstrated a remarkable similarity of interests and positions. To the extent a harm does occur, it will be temporal in nature because at the end of a complete five-year voting cycle, the entire desegregated area will be represented.

Imperfect representation is possible, if, and to the extent that the NCCPBE utilizes lateral transfers from one attendance zone to another as a part of its pupil assignment scheme. In that case, a parent may vote for a NCCPBE member in an attendance area different from that in which the parent's child attends school. The Court emphasizes that it does not restrict such transfers and the NCCPBE may effectuate them to the extent educationally desirable and/or necessary. Any resulting harm to the voting scheme is insignificant because attendance zones will not be autonomous districts and all NCCPBE members will be serving the educational interests of the entire unitary district.

**158.** *See* n. 55 *supra,* p. 992.

function urged upon it by plaintiffs but which it believes best performed outside the judicial realm. Plaintiffs have suggested that the Court should either continually monitor the transition to desegregation or formally appoint monitors to oversee the process.[159] The Court regards the daily business of running the schools, even during desegregation, as peculiarly the function of State and local officials. *See Milliken II, supra,* 97 S.Ct. at 2757. The inclusion of Wilmington proper participation on the governance unit assures representation of plaintiffs' interests and facilitates the Court's desire to studiously avoid undue interference with school board functions.

Finally, the provision that this election scheme shall control at least until 1985 is necessary to guarantee an effective transition to a racially nondiscriminatory unitary school system. The designated timing assures a complete turnover of district aligned NCCPBE seats and thus eliminates reference for voting purposes to districts no longer extant. Additionally, the requirement meshes with the date set for cessation of State defendants' responsibility for financing the costs of desegregation. *See* text *infra,* at 1038.

**B.** *Operating Costs of The Single District*

**1.** *Authorization for Setting A Local Tax Rate*

In Delaware, public school education is financed through a combination of state and local support. To supplement the state's contribution, the local school districts individually impose a tax upon the assessed value of real property located within their respective boundaries.[160] In recent years the eleven district combined local supplement has averaged between 31.03% and 34.80% of the current expense budget of public schools in the desegregation area.[161] Therefore although the primary source of finances for public education in the desegregation area is the State of Delaware, it cannot be said that the contribution by the local districts is insignificant. Notwithstanding a notable drop in enrollment, the expenditure by both the State of Delaware and local districts has pressed steadily upward both in terms of absolute dollars and on a per pupil basis. The increased spending in terms of absolute dollars despite declining enrollment belies any assertion that the level of state support to public education varies directly with student enrollment. This is illustrated by the following Chart 1, calculated from NCCPBE Exh. 19.

**159.** *See, e. g.,* Doc. 663 I, at 81–84 (Johnson).

**160.** 14 *Del.C.* §§ 1901 *et seq.*

**161.** Percentages have been calculated from NCCPBE Exh. 19:

| | |
|---|---|
| 1972–73 | 31.03% |
| 1973–74 | 33.12% |
| 1974–75 | 34.80% |
| 1975–76 | 33.22% |
| 1976–77 | 34.44% |

NCCPBE Exh. 19 represents the most complete cost data in evidence. At first blush there would appear to be several slight inconsistencies between data included in NCCPBE Exh. 19 and that in NCCPBE Exh. 1. The total projected tax yield of $32,998.4901 (NCCPBE Exh. 1, at D–53) for 1977–78 is lower than $36,023,798, the amount actually spent from local funds for 1976–77, perhaps because expenditures were made from reserves and delinquent tax collections. NCCPBE Exh. 19, at 3. Because actual level of expenditure is the controlling criterion, the information contained in NCCPBE Exh. 19 will be deemed dispositive.

It is noted, however, that NCCPBE Exh. 19 does not reflect the state's entire contribution toward current operating expenses. *See* Doc. 691. The most significant item missing is transportation, which is 100% state funded except for handicapped children. *Id.* The effect of exclusion of this item is to slightly inflate the percent of supplemental contribution by the local districts. Finally, comparable statistical data to that found in NCCPBE Exh. 19 for the current fiscal year (1977–78) will not be available until June 30, 1978. Doc. 691.

CHART 1

| Years | Enrollment | State Funds | Local Funds | Combined State and Local Funds | State Funds Per Pupil Expenditure | Local Funds Per Pupil Expenditure | Combined State and Local Funds Per Pupil Expenditure | Percentage Increase - State Funds Over Prior Year | Percentage Increase - Local Funds Over Prior Year | Percentage Increase - Combined State and Local Funds Over Prior Year | Percentage Increase Per Pupil Expenditure State Funds Over Prior Year | Percentage Increase Per Pupil Expenditure Local Funds Over Prior Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| '72-'73 | 84,961 | $56,856,657 | $25,580,660 | $82,437,317 | $669.21 | $301.09 | $ 970.30 | | | | | |
| '73-'74 | 83,289 | 58,890,788 | 29,169,567 | 88,060,355 | 707.07 | 350.22 | 1057.29 | 3.57 | 14.03 | 6.82 | 5.66 | 16.32 |
| '74-'75 | 81,280 | 62,191,228 | 33,187,041 | 95,378,269 | 765.15 | 408.31 | 1173.46 | 5.60 | 13.77 | 8.31 | 8.21 | 16.59 |
| '75-'76 | 78,524 | 64,937,207 | 32,306,253 | 97,243,460 | 826.97 | 411.42 | 1238.39 | 4.41 | - 2.65* | 1.95 | 8.08 | .76* |
| '76-'77 | 74,063 | 68,576,393 | 36,023,798 | 104,600,191 | 925.92 | 486.39 | 1412.31 | 5.60 | 11.50 | 7.57 | 11.97 | 18.22 |
| '77-'78 | 72,590 | (Not Available Until June 30, 1978)** | | | | | | | | | | |

* Loss in local district revenue was offset by declining enrollment on a per pupil expenditure basis.

** Doc. 691.

Despite increasing dollar contributions from both state and local authorities, the eleven local districts comprising the desegregation area operate at significantly disparate levels of support. In addition to severe differentials in assessed value of real estate (tax base), the financial disparity between local districts has been compounded because each local district establishes its own school tax rate, ranging for current operating expenses alone from a low of $0.84 for the Conrad District to a high of $2.669 for the Wilmington District.

The accompanying Chart 2 and graph (Chart 3) demonstrate the marked financial differences between the local districts. For example, Alexis I. has a per pupil tax base of $70,594 compared to DeLaWarr's $22,375. The luxury of a high per pupil tax base enables Alexis I. to expend local funds of $718.43 per pupil compared to DeLaWarr's $262.92, even though Alexis I. has a current

CHART 2

| District | Enrollment ('76-'77)* | Assessed Value of Real Estate** | Yield** | Assessed Value of Real Estate Per Pupil Based Upon '76-'77 Enrollment Data*** | Current Expense Real Estate Tax Rate Per $100** | Per Pupil Expenditure Based Upon '76-'77 Enrollment Data**** |
|---|---|---|---|---|---|---|
| Alexis I. | 3,089 | $218,064,550 | $1,936,413 | $70,594 | $.888 | $718.43 |
| Alfred I. | 9,105 | 383,238,899 | 4,077,661 | 42,091 | 1.064 | 541.16 |
| Claymont | 3,052 | 96,146,100 | 990,304 | 31,503 | 1.03 | 406.72 |
| Conrad | 4,827 | 152,844,000 | 1,283,889 | 31,664 | .84 | 401.25 |
| DeLaWarr | 2,864 | 64,081,340 | 553,342 | 22,375 | .8635 | 262.92 |
| Marshallton/McKean | 3,364 | 116,979,167 | 1,234,130 | 34,774 | 1.055 | 417.27 |
| Mt. Pleasant | 4,409 | 182,971,451 | 1,902,903 | 41,500 | 1.04 | 545.38 |
| New Castle Gunning-Bedford | 8,529 | 236,405,940 | 2,080,372 | 27,718 | .88 | 289.99 |
| Newark | 16,761 | 477,199,890 | 6,451,742 | 28,471 | 1.352 | 405.01 |
| Stanton | 4,699 | 153,483,650 | 1,785,014 | 32,663 | 1.163 | 468.03 |
| Wilmington | 13,364 | 401,001,153 | 10,702,720 | 30,006 | 2.669 | 724.10 |

\* NCCPBE Exh. 19. Source data is 1976-77 enrollment figures by district. The data is slightly contaminated by a small number of voluntary transfer students who attended school outside their districts. The 1976-77 data was deemed preferable to the later 1977-78 enrollment data by district because the latter is sufficiently contaminated by voluntary transfers to be seriously misleading. The per pupil expenditure figures are therefore somewhat inaccurate because enrollment dropped 1473 students between the 1976-77 and 1977-78 school years. For purposes of highlighting the inequities between districts, however, the distortion is minimal.

\*\* NCCPBE Exh. 1, at D-53.

\*\*\* Assessed value of real estate divided by enrollment.

\*\*\*\* Calculated from NCCPBE Exh. 19.

CHART 3

LOCAL FUNDS PER DISTRICT
FOR SCHOOL YEARS COMMENCING
1972 THROUGH 1976

expense tax rate of $0.888, only slightly higher than DeLaWarr's $0.8635.

At $724.10, Wilmington has the highest per pupil expenditure from local funds, although its tax base of $30,006 is the fourth lowest of the eleven local districts. This lofty expenditure occurs because Wilmington set the highest tax rate of the eleven districts $2.669 for current operating expenses. The figure is 97% higher than that of Newark, the next highest district, with a tax rate of $1.352. As a consequence, Wilmington's per pupil local fund expenditure is $319.09 more than the $405.01 per pupil local fund expenditure of Newark. The net result is that Newark educates 3397 more students than Wilmington for $2,888,420 less in local funds. Stated differently, Newark provides a public school education for 25% more students than Wilmington at 70% of the local cost of Wilmington.

The financial muddle is further complicated because some districts, such as DeLaWarr, have managed to qualify for state support, over and above that provided even-

ly to all districts.[162] As a consequence although a correlation exists among districts between per pupil expenditure from local funds and combined state and local funds, that correlation is not precise, particularly as between the districts with the lower per pupil expenditures from local funds.[163] As can be seen from the following charted bar graph (Chart 4), although DeLaWarr is the lowest district in tax base and per pupil expenditure from local funds, and would thus be expected to rank lowest in per pupil expenditure from combined state and local district funds, it in fact ranks above New Castle-Gunning Bedford, Newark, and Claymont. Also curious is that despite an

CHART 4

1976–77

State & Local

Dollars

(Per Pupil)

162. DeLaWarr appears to have an unusual number of special students who qualify for state support. *See* D.P.I. Exh. 8, App. A, at unnumbered 4.

163. Following are the districts ranked from lowest per pupil expenditure from local funds to the highest, compared with respective ranking in combined state and local expenditure per pupil. The figures in ($ ) represent the actual respective expenditures per pupil based on 1976–77 enrollment data. Sources are NCCPBE Exh. 1, at D–53; NCCPBE Exh. 19; and calculations made therefrom:

| District | Ranking From Lowest To Highest by District Of Per Pupil Expenditure From Local Funds | | Ranking By District of Per Pupil Expenditure From Combined State and Local Funds | |
|---|---|---|---|---|
| DeLaWarr | 1 | ($262.92) | 4 | ($1372) |
| New Castle-Gunning Bedford | 2 | ($289.99) | 1 | ($1154) |
| Conrad | 3 | ($401.25) | 5 | ($1386) |
| Newark | 4 | ($405.01) | 2 | ($1234) |
| Claymont | 5 | ($406.72) | 3 | ($1353) |
| Marshallton-McKean | 6 | ($417.27) | 6 | ($1402) |
| Stanton | 7 | ($468.03) | 7 | ($1430) |
| Alfred I. | 8 | ($541.16) | 9 | ($1479) |
| Mount Pleasant | 9 | ($545.38) | 8 | ($1472) |
| Alexis I. | 10 | ($718.43) | 10 | ($1672) |
| Wilmington | 11 | ($724.10) | 11 | ($1702) |

attempt to equalize, the addition of state funds aggravates rather than mitigates the difference in per pupil expenditure between the districts.[164]

In summary, as illustrated on Chart 2, there now exist in the desegregation area eleven different per pupil tax bases. The predominantly white district of Alexis I. has a $70,594 per pupil tax base, over three times that of DeLaWarr and over twice that of seven other districts. In addition, there are eleven separate local per pupil expenditure rates varying from $724.10 to a low of $262.92, with the local per pupil expenditure of two districts (predominantly black Wilmington and predominantly white Alexis I.) being roughly two and one-half times that of the two lowest districts (predominantly black DeLaWarr and predominantly white New Castle-Gunning Bedford). Further, as denoted on Chart 2, there are eleven widely varying tax rates so disparate that the highest tax rate (predominantly black Wilmington) is three times greater than that of four of the districts and more than double most of the other districts. The enormity of the disparity is further highlighted by realizing that Alexis I., with one of the lower tax rates, produces the second highest per pupil local supplement, only some $6 behind Wilmington.

Creation of one district requires that one tax base consisting of the total assessed value of real estate in the desegregation area be substituted for the eleven disparate tax bases; that one rate for pupil expenditure from local funds supplant the present eleven; and, most importantly, that one tax rate be applied evenly throughout the desegregation area. Imposition of a single tax rate carries with it several ramifications. Redistribution of school tax burden throughout the entire desegregation area will eradicate existing disparities and resultant inequities between present districts. Equalizing the per pupil expenditure, however, requires a tax increase in ten of the eleven districts.

■ With these preliminary observations in mind, attention is devoted to the necessity for setting a school tax rate. Authorization to set a school tax rate is properly a product of the political process. For that reason, it is my view a federal court should not become involved failing a total abdication of responsibility over a period of time such that further delay significantly jeopardizes constitutional rights. In this regard, over two years have passed since the Supreme Court summarily affirmed the existence of a constitutional violation,[165] and over seven months have elapsed since the Third Circuit affirmed the propriety of an inter-district remedy.[166] In the interim, a scheduled September 1977 date for commencement of implementation of a remedy to redress the constitutional violation was stayed [167] pending the October 4, 1977 denial of certiorari applications in the Supreme Court.[168]

From evidence adduced at the 1977 July, October, and November hearings, the Court finds it abundantly clear that the luxury of further delay comes at the cost of endan-

---

**164.** The State of Delaware, through defendant D.P.I., initially finances the various districts with a constant level of support, see 14 *Del.C.* §§ 1701 *et seq.*, and also provides a method to obtain equalization funds. *See* 14 *Del.C.* § 1707. Because of the widely varying tax bases and tax rates between local districts, the amount spent on each pupil per district continues to be vastly different despite "equalization". The greatest difference in per pupil local expenditures is $461.18. *Compare* Wilmington *and* DeLaWarr. When state and local funds are combined, the differential jumps $87 to $548, the difference between Wilmington at $1702 and New Castle-Gunning Bedford at $1154.

**165.** 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975):

**166.** 555 F.2d 373 (3d Cir. 1977).

**167.** 435 F.Supp. 832 (D.Del.1977).

**168.** —— U.S. ——, 98 S.Ct. 235, 54 L.Ed.2d 160, (1977).

gering an orderly transition to a racially nondiscriminatory unitary school system. That cost cannot be afforded by the children and their parents, school administrators, teachers, and the citizenry of the desegregation community. Planning has been going forward on a broad scale. The time for hiring the top administrative staff is now here with the NCCPBE being compelled to make financial decisions in a revenue vacuum. Similarly fast approaching is the time for commencement of collective bargaining.[169] Because a substantial portion of administrators' and teachers' salaries is paid from local funds, personnel matters cannot effectively proceed without establishing a local tax rate or, at least, the parameters for that rate.

It is with deep seated reluctance overcome only be the pressing, immediate necessity and the realization that no other option is available to fill the legislative void that the Court becomes involved at all in matters of taxation. Were it not true that the desegregation process faces imminent peril unaddressed by any other practical alternative, the federal court would not intrude. If the political process had provided statutory machinery or a procedure for devising a tax rate for the single district, or if there were not an immediate need to act now, I would further defer the matter of local tax rate authorization.

The Court is compelled, however, to order that a tax rate be established. This action is taken with the understanding that the Legislature can alter the parameters authorized. Because state political processes are preferred over even limited intervention by a federal court, the Delaware Legislature may raise or lower the tax authorization

established here. The Court must caution, however, that any legislative action that lowers the established tax rate below a generally acceptable rate to a point at which the desegregation process would be imperiled will be received skeptically. Given the historical stance of the Legislature, if such a lowering occurs, the usual presumption of legislative regularity will not attach. If, as an alternative, the Delaware Legislature makes provision for replacement of the authorized revenue lost through reduced local school tax rates, the local school tax rate can be lowered to any level or even eliminated.[170]

Authorization for a local tax rate involves the dual questions who should be authorized to set the tax rate and what upper limit should be placed on that power. In keeping with the principle of minimizing federal intrusion, the Court rejects any notion that it should establish the tax rate for the desegregation area. Instead, the determination who should be the taxing authority for the reorganized single district will be answered by resort to the system used for a reorganization pursuant to the Educational Advancement Act.[171] Under that Act, the power to establish a tax rate is lodged in the "school board of the reorganized district."[172] Accordingly the school board of the single district is authorized to establish the local school tax rate for the single district.

The tax rate for the single district consists of four components: (1) current operating expense, (2) debt service, (3) tuition, and (4) minor capital improvements. The last three items constitute necessary obligations and are relatively fixed in total amount of obligation even though the elev-

---

**169.** See Doc. 632 (Order setting in motion the process for election of a bargaining representative); Doc. 689 (Memorandum Opinion on a related matter).

**170.** If public education is to survive in its present from, the declining birth rate coupled with concomitant declining enrollment and the increased aging of the population graphically

display the necessity for replacing the referendum as the only method of supplementing education finances. Such a decision is a political matter properly left to the political processes.

**171.** 14 Del.C. §§ 1001 et seq.

**172.** 14 Del.C. § 1010.

en individual districts have a different tax rate for each item.[173] Following state law for securing debt service and minor capital improvements, and seeking to retain the dollars generated by tuition charges, the NCCPBE has calculated that an equalized tax rate for these items throughout the single district would be $.32.[174]

Having carefully reviewed the available data and found the same to be correct, the Court authorizes the NCCPBE to set a tax of up to $.32 for these items for the fiscal year commencing July 1, 1978. Specifically, the NCCPBE and its successor are limited to $.24 to meet all debt service obligations for fiscal year 1978,[175] and every year thereafter may set such amount as is sufficient to satisfy its bond obligations. A level tax rate sufficient to satisfy tuition requirements of the component districts is $.04896, and a level rate of $.027 [176] is required for minor capital improvements. Thus the NCCPBE and its successor are authorized to set a tax rate of up to $.05 for tuition,[177] and up to $.03 for minor capital improvements for the fiscal year commencing July 1, 1978, and all subsequent years.[178] This authorization up to $.32 for the fiscal year commencing July 1, 1978,[179] must be added to whatever amount is established by the NCCPBE as the tax rate for current operating expenses.

Attention is now turned to the difficult matter of establishing a maximum amount that the NCCPBE may fix as the tax rate necessary to meet current operating expenses.[180] The NCCPBE correctly points to 14 *Del.C.* § 1010 as authorizing the school board to establish an adjusted tax rate "which may be sufficient to maintain in and throughout the reorganized school district a per pupil expenditure level equivalent to that of the highest per pupil expenditure level of any of its component former school districts." The New Board then deduces it should be authorized to establish a local

---

**173.**

| District | Debt Service | Tuition | Minor Capital Improve-ments | Total By District |
|---|---|---|---|---|
| Alexis I. | $ .32 | $ .02 | $ .011 | $ .351 |
| Alfred I. | .216 | .039 | .018 | .273 |
| Claymont | .18 | .07 | .01 | .26 |
| Conrad | .09 | .08 | .03 | .20 |
| DeLaWarr | .29 | .64 | .1165 | 1.05 |
| Marshallton-McKean | .21 | .06 | .055 | .325 |
| Mount Pleasant | .175 | .042 | .023 | .24 |
| New Castle-Gunning Bedford | .26 | .02 | .05 | .33 |
| Newark | .313 | .035 | .03 | .378 |
| Stanton | .30 | .04 | .05 | .39 |
| Wilmington | .271 | --- | --- | .271 |

Compilation and computation is from NCCPBE Exh. 1 at D–49, D–57, D–59, based on anticipated yield 1977–78.

**174.** NCCPBE Exh. 1, at 18.

**175.** The actual rate would be $.25, but anticipated carry-over balances from the component districts permit a reduction to $.24 as the amount needed by the single district to meet the debt service obligations of all the component districts for the fiscal year commencing July 1, 1978.

**176.** The NCCPBE stated: "An equalized Minor Capital Improvement Tax Rate for a single district to yield [the present] $667,614 on a combined assessment of $2,482,416,140 would be $.0279 on each $100 of assessed valuation."

Verification of the computation revealed the rate is closer to $.0270. NCCPBE Exh. 1, at D–59.

**177.** In a single district, costs for tuition should drop significantly, despite continuation of payments presently made from tuition revenues for charges originating outside the affected area and the costs of transportation to specialized schools. But any reduction in tuition which might occur has no effect on the needed revenue yield. At best, only the revenue category would change from tuition to current operating expense.

**178.** If the NCCPBE feels there is required broader tax authorization similar to that provided for debt service for tuition and minor capital improvements for subsequent fiscal years, it should file a motion seeking amendment of the Order to be entered pursuant to this Opinion.

**179.** By reference to the Chart in n. 173, *supra,* residents of the respective districts can determine whether the leveling of rates for debt service, tuition, and minor capital improvements increases or decreases this portion of their local school tax charge.

**180.** An increase of one cent in the current expense tax rate yields $248,241. NCCPBE Exh. 1, at D–54.

current operating expense tax rate of up to $2.669, Wilmington's current rate, producing a per pupil expenditure of $724.10.[181]

Defendant State Board urges the NCCPBE should not be permitted such a high maximum limit on its authority to establish a local current operating expense tax rate. Although the State's proposed formulation is ambiguous, the NCCPBE interprets the State Board's position as in effect establishing the maximum authorization for current operating expenses "upon the basis of the average per pupil expenditure in the eleven districts plus an additional ten percent."[182] In the context of this case, a significant difference exists between a tax rate based upon current per pupil expenditures and one based upon current expense tax revenues. A closer reading of

the State Board's position reveals that under its proposal per pupil expenditure is in reality limited to current expense tax revenues plus 10%,[183] thus resulting in a lower rate than that deduced by the NCCPBE.

After careful consideration, the Court concludes neither the position of the NCCPBE nor that of the State Board should be adopted. The position of the State Board is rejected because, if in fact its formula is based upon current expense tax revenues plus ten percent, the procedure is contrary to state law and, on the information available in the record, would most likely constitute a reduction in per pupil expenditure from that which now applies. In contrast the position of the NCCPBE is rejected although it comports strictly with 14 *Del.C.* § 1010 as well as this Court's philosophy of placing maximum

---

**181.** In reality, a current operating expense tax rate of $2.413 produces $9,676,842 on an assessed tax base of $401,001,153 which, in turn, yields Wilmington's per pupil expenditure of $724.10. NCCPBE Exh. 19. Because it makes no difference in the outcome, however, the Wilmington published current expense rate of $2.669 has been and will be used throughout this Opinion.

**182.** Doc. 692.

**183.** Doc. 693 contains the proposal from defendant State Board. One cannot say it is unequivocal; at one point "per pupil expenditures" is mentioned thusly:

"It is the State's position that a tax rate which would yield local revenues in an amount consistent with the amount presently generated in accordance with per pupil expenditures is consistent with existing law. . . ."

At a later portion of Doc. 693, however, the State Board becomes very specific, shifting the emphasis from per pupil expenditure to "present revenues". Quoted below is the State Board formulation, with the actual projected mathematical calculations in brackets following each step.

"The school board of the new district may without election or referendum, in addition to the amounts apportioned to it by the State Board of Education or appropriated to it by the General Assembly, levy and collect additional tax for current expenditures for fiscal year 1979 according to the following procedure:

1. Divide the total local current expense tax dollars collectible in the entire area being reorganized, as established for the fiscal year ending June 30, 1978, as computed using the assessed value and tax rates contained in *Assessments and Tax Rates*, Delaware Public Schools 1977–78, Department of Public Instruction, August, 1977, by the total pupil enrollment in the entire area, as certified by the State Board of Education as a result of the count of enrollment on September 30, 1977.

$$[\frac{\$32,040,177}{72,590} = 441.39]$$

2. The per pupil amount determined in (1) above shall be increased by 10%.

[441.39 + 10% = 441.39 + 44.14 = $485.53]

3. The New Board of Education may set a tax rate for current expenses that would be adequate to yield up to the number of dollars per pupil provided in step (2) above.

4. To determine the tax rate the New Board shall multiply the dollars per pupil derived in step (2) above by the number of pupils resident in the new district who attend a public school in the area being reorganized during fiscal year 1978; the product would then be divided by the assessed value of property in the new district as determined during the fiscal year ending June 30, 1978."

[485.53 × 72,590 = $35,244,622 ÷ 2,482,416,140 = a $1.42 current operating expense tax rate.]

$2,482,416,140 is the assessed value of property in the affected area. NCCPBE Exh. 1, at D–53.

flexibility in the NCCPBE. Although the legal position of the NCCPBE, if viewed in isolation, is virtually impregnable, three underlying facts cause the Court to rule in a manner adverse to the New Board. In my view any *one* of the following facts mandates that equitable discretion be exercised by granting the NCCPBE tax authorization far short of that requested by the New Board and permitted by analogous state law although fully adequate to accomplish the job at hand. These facts are: (1) the NCCPBE has conceded through its representatives its requested authority is neither necessary nor realistic; [184] (2) the Wilmington current expense rate of $2.669, almost double that of the next highest district, is an aberration; (3) the Wilmington rate was set without the inhibition of a referendum and cannot be said to represent the will of the people.

What follows is a detailed analysis of the method employed to arrive at the maximum authority that may reasonably be afforded the NCCPBE in fixing the current operating expense component of the school tax.

The controlling principle is that insofar as practical a court should exercise its discretion in accordance with State law, always remaining mindful that the beleaguered taxpayer ought not to incur a tax increase beyond that absolutely essential for effective reorganization. Pursuant to 14 *Del.C.* § 1010, the starting point for constructing a tax rate in a reorganized district is the per pupil expenditure for the fiscal year prior to reorganization.[185] Because reorganization must be fully effective as of July 1, 1978, it follows that the per pupil expenditure of the school year 1977–78 should control. Unfortunately, however, the unavailability of per pupil expenditure data for the current school year until June 30, 1978 [186]

necessitates the use of well informed estimates.

Having declined to adopt and adjust the 1976–77 per pupil expenditure figure ($724.10) of the highest district, the Court logically should next consider the Alexis I. District, with the second highest per pupil expenditure at $718.43 for 1976–77. But Alexis I. contains an extraordinarily large tax base and may more reasonably be considered an aberration than a suitable model upon which to pattern the other districts. Consequently Alexis I. is rejected as the benchmark for the single district. The choice then becomes whether to use the per pupil expenditure of the next highest district, Mount Pleasant, or an average of the eleven districts with an adjustment, to achieve as nearly as is practicable the Delaware statutory goal of keying the current operating expense tax rate to the district with the highest per pupil expenditure. Calculations reveal these two methods to produce only a slight difference in result.

The best method for arriving at estimates for the per pupil expenditures in the current 1977–78 school year is to rely on historical fact and percentage increases over time. Fortunately, all necessary data is in the record.[187] From this data one can compute a maximum tax rate that provides a sufficient yield to operate the schools, comports with the spirit of extant statutes, and limits to some reasonable degree the burden on the taxpayer. The actual calculations of the following seven steps are shown on Chart 5, which appears at the end of the textual description of the seven steps.

The first step in limiting the power of the NCCPBE to fix the current operating component of the local tax rate is to ascertain the percentage rate of increase for the last five school years for which hard data is

184. *See, e. g.,* Doc. 663E, at 61 (Kirk):
"Yes, I think that is much too high as a tax rate in this county, based on what now exists and the cost to the taxpayer."

185. 14 *Del.C.* § 1010 authorizes an adjusted tax rate at a level "equivalent to that of the highest

per pupil expenditure level of any of its component districts."

186. Doc. 691.

187. NCCPBE Exh. 19.

available. This is accomplished by subtracting the per pupil expenditure of a former year from that of the following year and dividing the resultant number by the per pupil expenditure of the former year.

Step 2: Thereafter, the percentage increases should be aggregated and divided by 4.

Step 3: The resultant number from Step 2 is converted from a percentage average to a decimal number. Thereafter the 1976–77 per pupil expenditure is multiplied by the decimal figure to ascertain the absolute dollar amount that the per pupil expenditure will most likely have increased from the 1976–77 school year to the current 1977–78 school year.

Step 4: The probable dollar amount of per pupil expenditure increase for the current year is added to the per pupil expenditure for the 1976–77 school year yielding the probable per pupil expenditure for the current school year. As can be seen from the computations, the per pupil expenditure for the current year on an eleven district average basis is about $549.49, compared to about $622.63 for Mount Pleasant.[188]

Step 5: The eleven district average pupil expenditure is adjusted pursuant to the clear statutory requirement of using the highest per pupil expenditure of the component districts of the reorganization area. This adjustment was made by ascertaining the dollar amount by which the Mount Pleasant per pupil expenditure exceeded the eleven district average. Thereafter,

that dollar amount was converted to an adjustment figure of 12.13% by dividing the dollar amount by the 1976–77 eleven district average per pupil expenditure. The percentage adjustment figure is then converted to a decimal and multiplied by the $549.49 figure from Step 4. The resulting dollar figure is then added to the $549.49.

Step 6: The per pupil expenditure figure of $616.44 resulting from Step 5 of the now adjusted eleven district average and the $622.63 figure from Step 4 for Mount Pleasant must next be adjusted for the actual additional costs of desegregation, a cost element not contemplated by the present Delaware statutes. Independent of their analysis, the State has suggested a ten percent increase to cover additional costs attributable solely to desegregation. Because of the disposition made with respect to those costs, the Court concludes 5% is sufficient. Adding 5% desegregation costs results in a per pupil expenditure of $646.95 on an adjusted eleven district basis and $653.76 for Mount Pleasant.

Step 7: The final step is to take each of the adjusted per pupil expenditure figures and multiply the same by the actual enrollment for the current year, 72,590. The resultant figure is the current operating expense tax yield necessary to cover the per pupil expenditure for the current year as adjusted. The tax yield figure is then converted into a tax rate necessary to raise the required funds. See NCCPBE Exh. 1, at D–54.

---

**188.** Calculated projections for the current year would indicate Alfred I. at $624.57 has passed Mount Pleasant at $622.63 for per pupil expenditure in 1977–78. Because the hard data places Mount Pleasant as the higher of the two over the last five years and because of a preference for hard data, Mount Pleasant was considered a more reliable indicator of the district with the highest per pupil expenditure.

CHART 5

| | 11 District Average | | | Mount Pleasant | |
|---|---|---|---|---|---|

**Step 1**

| Year | Per Pupil Expenditure | % Increase of Per Pupil Expenditure Over Prior Year | | Per Pupil Expenditure | % Increase of Per Pupil Expenditure Over Prior Year |
|---|---|---|---|---|---|
| 1972–73 | $ 301.09 | | | $ 325.06 | |
| 1973–74 | 350.22 | 16.32% | | 390.49 | 20.13% |
| 1974–75 | 408.31 | 16.59% | | 473.72 | 21.31% |
| 1975–76 | 411.42 | .76%* | | 470.75 | −.63%* |
| 1976–77 | 486.39 | 18.22% | | 545.38 | 15.85% |
| | | 51.89 | | | 56.66 |

**Step 2** $\frac{51.89}{4} = 12.9725$ $\frac{56.66}{4} = 14.165$

**Step 3** $ 486.39 x .129725 = $63.10 $ 545.38 x .14165 ≈ $77.25

**Step 4**
$ 486.39
$\underline{\hspace{0.5cm}63.10}$
$ 549.49

$ 545.38
$\underline{\hspace{0.5cm}77.25}$
$ 622.63

**Step 5**
$ 545.38
$\underline{-486.39}$
$ 58.99

$\frac{58.99}{486.39} = 12.13\%$

$ 549.49 x .1213 = $66.65

$ 549.49
$\underline{\hspace{0.5cm}66.65}$
$ 616.14

NOT APPLICABLE

**Step 6** $ 616.14 x 1.05 = $646.95 $ 622.63 x 1.05 = $653.76

**Step 7** $ 646.95 x 72,590 = $46,962,100 = $ 653.76 x 72,590 = $47,456,438 =
T.R. = $1.89 T.R. = $1.91

\* The 1975–76 percentages are obviously attributable to poor tax collections during the recession. Recessions are economic facts of life and in every real sense act as a restraint on spending. However, an analysis of recent per pupil expenditures demonstrates that in 1976–77, the local districts spent more than 3 million dollars in per pupil expenditure than was received in current operating expense revenue for the same period. Therefore, it seems appropriate not to "throw-out" the 1975–76 year.

The preceding computations yield maximum current operating expense tax rates of $1.89 on an adjusted average eleven district basis and $1.91 if calculated directly against the rates for Mount Pleasant. Because use of the highest district per pupil

expenditure more closely follows the statute than use of an adjusted average per pupil expenditure, the $1.91 figure is adopted.[189]

CHART 6

| District | '76-'77[*] Enrollment | Current Operating Expense Tax Yield ('76-'77)[**] | Current Expenditure Funds Actually Expended By District[*] | Total Pupil Expenditure By District In Excess of Tax Yield | Per Pupil Expenditure In Excess Of Tax Yield By District |
|---|---|---|---|---|---|
| Alexis I. | 3,089 | $ 1,936,413 | $2,219,221 | $ 282,808 | $ 91.55 |
| Alfred I. | 9,105 | 4,077,661 | 4,927,230 | 849,569 | 93.31 |
| Claymont | 3,052 | 990,304 | 1,241,323 | 251,019 | 82.25 |
| Conrad | 4,827 | 1,283,889 | 1,936,850 | 652,961 | 135.27 |
| DelaWarr | 2,864 | 553,342 | 752,990 | 199,648 | 69.71 |
| Marshallton/ McKean | 3,364 | 1,234,130 | 1,403,700 | 169,570 | 50.41 |
| Mt. Pleasant | 4,409 | 1,902,903 | 2,404,597 | 501,694 | 113.79 |
| New Castle Gunning-Bedford | 8,529 | 2,080,372 | 2,473,341 | 392,969 | 46.07 |
| Newark | 16,761 | 6,451,742 | 6,788,422 | 336,680 | 20.09 |
| Stanton | 4,699 | 1,785,014 | 2,199,282 | 414,268 | 88.16 |
| Wilmington | 13,364 | 10,702,720 | 9,676,842 | -1,025,878 | -76.76 |

Source: * NCCPBE Exh. 19
 ** NCCPBE Exh. 1, at D-53

---

**189.** 14 Del.C. § 1010 contains a limitation that upon reorganization the current operating expense tax rate not exceed forty cents over the highest current operating expense tax rate of the component districts. Although the $1.91 rate is well under that presently operative in Wilmington, one could argue that once rejected as the benchmark, Wilmington's rate ought not to be considered for any purpose. In that case, the $1.91 rate exceeds the sum of forty cents over the penultimate existing tax rate of Newark, at $1.352. The Educational Advancement Act is inconsistent with the $1.91 result but the Court notes that the Act was expressly directed to reorganization that occurred in the late 1960's. Strict adherence to it by use of the Newark rate plus forty cents, or $1.752, would result in a per pupil expenditure of $1.82 which is lower than that currently spent on each of the almost 30,000 children educated in Wilmington, Alexis I., Alfred I., and Mount Pleasant. Finally, application of the forty cent limitation ignores the reality that heavy use of current expense reserves has distorted the normally close relationship between tax rate and per pupil expenditure. *See* Chart 6.

From the foregoing analysis, it is concluded that the NCCPBE must be authorized to set a tax rate of up to $1.91 to cover current operating expenses and, in addition, any rate up to $.32 to satisfy debt service, minor capital improvements, and tuition. The New Board strongly is cautioned against using the full limit of its power during the early years of its governance of the single district. The full authorization is not surrendered if not used and the New Board is on notice that it will assume a greater share of the desegregation costs in future years as the state contribution diminishes. Furthermore, additional authorization will not be granted except for unforeseen circumstances over which the NCCPBE has no control and which could not be reasonably anticipated.[190] Consequently, because the New Board will have to live with these limitations until a referendum passes or the Legislature provides another method of school financing, prudence dictates holding as much of the authorization in reserve as possible.

However cautious the New Board's approach, the Court is not unmindful that the financial impact will result in an increased economic burden upon all real property owners in the desegregation area except those in Wilmington. Other courts, however, have upheld constitutional provisions in their states requiring "a thorough and efficient education" notwithstanding the resultant economic hardships to local taxpayers.[191] *Robinson v. Cahill*, 70 N.J. 155, 358 A.2d 457 (1976) ("*Robinson VII*"); *see Serrano v. Priest*, 18 Cal.3d 728, 135 Cal.Rptr. 345, 557 P.2d 929 (1976).

Moreover, the increased financial burden is largely a function of a single tax rate

rather than a result of desegregation. In 1976–77, $36,023,798 was actually expended for current operating expenses.[192] Had the districts not been spending out of reserves, a level rate of $1.45 would have been required for current operating expenses alone.[193] Based on past spending patterns, it is estimated that this year, the average per pupil expenditure is $549.49.[194] Multiplied by the 72,590 pupils currently enrolled in the desegregated area,[195] the total expenditure is $39,887,479, which can be raised only if the systemwide tax rate for current expenses was set at $1.61. If the proposal of the State Board were followed and maximum authorization for a current expense tax rate fixed at $1.42, the NCCPBE would have to operate the new single district for the 1978–79 school year at a tax rate three cents less than was actually spent on a per pupil basis during the 1976–77 school year, and at a rate nineteen cents less than required by the projected per pupil expenditure for the current year.

The foregoing makes evident that increased taxation results from the imposition of a unitary tax, independent of any consideration of the costs of desegregation. The impact of equalizing the tax rate is especially severe because ten of the eleven districts, as a result of drawing against reserves, have spent a per pupil amount significantly higher than that provided by incoming tax revenues. If the integrity of per pupil expenditures is to remain intact as contemplated by state law, a tax rate that realistically comports with actual per pupil spending must be authorized. Because $1.61 is the tax rate required to yield the estimated current expenses for 1977–78 and

190. By way of guidance only, the NCCPBE is advised salary costs of administrators, teachers, non-certificated personnel and all other employees of the single district, and lack of a successful referendum pursuant to 14 *Del.C.*, Chapter 19, are not considered either unforeseen or circumstances over which the NCCPBE has no control.

191. A similar provision requiring the General Assembly to establish and maintain a "general and efficient" system of free public schools appears in the Delaware Constitution, Art. X, § 1.

192. NCCPBE Exh. 19, at unnumbered 3.

193. This fact demonstrates the understandable, but fatal, error of confusing revenues earmarked for current operating expenses with actual current operating expenses. For an example of this phenomenon, *compare* NCCPBE Exh. 1, at 18, D–54 *with* NCCPBE Exh. 19, at unnumbered 3.

194. *See* Chart 5 *supra*, at Step 4.

195. D.P.I. Exh. 4.

$.32 is the tax rate necessary to satisfy debt service, tuition, and minor capital improvements, the sum of $1.93 is the minimum rate which represents an equalized tax. As illustrated by the accompanying Chart 7, even this amount represents a substantial increase, particularly for five districts whose tax rates increase by a rate of over 50%. If one takes the equalized tax and adjusts it upward to comport with Delaware law, setting the highest per pupil expenditure rate as the benchmark, the cost necessarily increases. The addition of 5% desegregation costs only completes the already expensive financial picture. Thus, as illustrated in Chart 7, if the NCCPBE were to utilize the full range of its power in setting a tax rate, one district would experience an increase of 114%, six others would incur raises well in excess of 50% of current rates, and another would suffer a 43% increase.

CHART 7

| Reference | Col | Wilmington | Stanton | Newark | New Castle – Gunning Bedford | Mount Pleasant | Marshallton/ McKean | DelaWarr | Conrad | Claymont | Alfred I. | Alexis I. | District |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| See text supra, at 1026. | 1 | .271 | .390 | .378 | .330 | .240 | .325 | 1.050 | .200 | .260 | .273 | $.351 | Current debt services, tuition and minor capital improvement tax rate |
| NCCPBE Exh.1, at D-53 | 2 | 2.669 | 1.163 | 1.352 | .88 | 1.04 | 1.055 | .8635 | .84 | 1.03 | 1.064 | $.888 | Current operating expense tax rate |
| Add Column 1 plus Column 2 | 3 | 2.94 | 1.553 | 1.73 | 1.21 | 1.28 | 1.38 | 1.914 | 1.04 | 1.290 | 1.337 | $1.239 | Total current local school tax rate by district |
| See text supra, at 1026. | 4 | .32 | .32 | .32 | .32 | .32 | .32 | .32 | .32 | .32 | .32 | $.32 | Level current debt services, tuition and minor capital improvements resulting from an equalized tax base based on calculated current per pupil expenditure |
| See text supra; at 1033. | 5 | 1.61 | 1.61 | 1.61 | 1.61 | 1.61 | 1.61 | 1.61 | 1.61 | 1.61 | 1.61 | $1.61 | Level current operating expense tax rate resulting from an equalized tax base and based on current per pupil expenditure |
| Add Column 4 plus Column 5 | 6 | 1.93 | 1.93 | 1.93 | 1.93 | 1.93 | 1.93 | 1.93 | 1.93 | 1.93 | 1.93 | $1.93 | Level local tax rate resulting from an equalized tax base on the basis of current per pupil expenditure and without increases by reason of Delaware statute or Costs of desegregation |
| Subtract Column 3 from Column 6; divide product by Column 3 | 7 | -34% | 24% | 12% | 60% | 51% | 40% | 01% | 86% | 50% | 44% | 56% | Percentage of increase of equalized tax base local school tax rate over current district school tax rate |
| See text supra, at 1031–1033. | 8 | 1.91 | 1.91 | 1.91 | 1.91 | 1.91 | 1.91 | 1.91 | 1.91 | 1.91 | 1.91 | $1.91 | Level maximum current operating expense tax rate resulting from equalized tax base but adjusted for Delaware statute plus 5% for costs of desegregation |
| Add Column 4 plus Column 8 | 9 | 2.23 | 2.23 | 2.23 | 2.23 | 2.23 | 2.23 | 2.23 | 2.23 | 2.23 | 2.23 | $2.23 | Level maximum local tax rate resulting from equalized tax base adjusted for Delaware statute plus 5% for costs of desegregation |
| Subtract Column 3 from Column 9 | 10 | -.71 | .667 | .50 | 1.02 | .95 | .85 | .316 | 1.190 | .940 | .893 | $0.991 | Dollar amount by which local tax rate based on an equalized tax base if NCCPBE uses maximum authorized per $100 of assessed valuation |
| Divide Column 10 by Column 3 | 11 | -24% | 43% | 29% | 84% | 74% | 62% | 17% | 114% | 73% | 67% | 80% | Percentage increase of maximum authorized level school tax rate resulting from an equalized tax basis (single district) over the current district local tax rate |

Because of the widespread nature and potential severity of the local school tax increase and the system of paying school taxes in advance and due September 30th of each year, it is absolutely essential that the local school tax rate be established as quickly as possible. Only by knowing the new school rate will the vast majority of the real property owners in the desegregation area have an opportunity to perform the necessary planning to meet their obligations. For that reason, the NCCPBE will be ordered to establish a local school tax rate for the single district by February 24, 1978, replacing the usual May date applied to reorganizations.[196]

### 2. Governance—Allocation of Costs

Consolidation of the eleven existing school districts requires an orderly transfer of authority from the existing school boards to the NCCPBE, which will become the governing body of the single school district by July 1, 1978. Reference to existing state laws provides at least some basis for an orderly transition. Accordingly, the manner of appointment of the NCCPBE and the subsequent election of its successor, as well as the determination of a maximum tax rate, were arrived at in accordance with the spirit of the Delaware statutory scheme.

All parties recognize the desirability of following State law, even though no existing enactment envisions administration of a single district of 70,000 students.[197] But although the parties agree that State law should govern to the extent feasible, they dispute the judicial treatment to be granted irrelevant and/or unsuitable provisions of the Delaware reorganization framework. The State Board's position is that alterations to present legislation, technical or otherwise, are exclusively the province of the

Delaware Legislature. One can hardly disagree with that statement as a general proposition. But general propositions are unavailing in this unique situation because existing statutes would, if applied literally, be distinctly at variance with the successful operation of a single district.

Because the Legislature not only failed to pass governance legislation but also refused to modify State law to take cognizance of the unitary district, the NCCPBE is on the verge of assuming the considerable task of operating a large school system without guidance from any meaningful, comprehensive statutory scheme. Understandably, the New Board requires instruction concerning which of the numerous existing statutes apply and if they must be deemed modified. Absent legislative efforts, the Court must provide that guidance.

One alternative would be to fill the legislative void by devising an entirely new statutory framework under which the single district would conduct its affairs. In order to minimize federal court intrusion, this approach has been rejected. Instead, sections of the existing Delaware Code that would appear to be both inapplicable and troublesome to the NCCPBE have been identified and evaluated. Appended to the Order that will accompany this Opinion is a compilation of statutory changes of which the NCCPBE shall take note in the conduct of its affairs. This procedure possesses the advantage of retaining existing law to the greatest degree possible, a philosophy that has been pursued throughout these proceedings.

All parties understand that upon reorganization, ownership of all real and personal property of the several districts as well as all indebtedness and obligations of the several districts will become the responsibility

---

196. See 14 *Del.C.* § 1021(e).

197. The statutory provisions, particularly those providing for State funds, contemplate a dis-

trict of some 12,000 children and are therefore inadequate to govern a district of 70,000. *See, e. g.,* 14 *Del.C.* § 1321.

of the new district and the NCCPBE. All parties agree that in governing the new district, the NCCPBE must be empowered to negotiate employment contracts and deploy personnel as required to realize the goal of a racially nondiscriminatory school system. General recognition also prevails that the salaries set in existing individual employment contracts entered into between the several districts and their school employees should be honored. Therefore, subject to the terms of compensation of the existing contracts with individual employees the NCCPBE may transfer, reassign or terminate school employees as it deems fit.

The New Board also is granted broad latitude in matters of personnel, including the future setting of salaries. Teachers and staff presently employed under varying contracts with their respective districts will be negotiating in the future with one employer. In this connection, the issue whether staff salaries ought to be "levelled up" has again surfaced. This Court agrees with the three-judge court that previously declined to order "levelling up" [198] because employer-employee relations are uniquely the responsibility of the New Board. To provide maximum flexibility to the NCCPBE, 14 *Del.C.* §§ 1008–09, containing provisions with regard to salaries in a statutory reorganization, are expressly disavowed as controlling in this circumstance. Consequently, the NCCPBE may, within the financial constraints imposed, choose to operate at different salary levels or at a uniform rate with an adjustment upward or downward.

The State Board has agreed to continue its financial support for administrators under existing contracts for whom funding has been heretofore provided by the State. In accordance with the position of the State Board, the NCCPBE has acknowledged that upon expiration of these contracts, the State's funding of these employees' contracts should cease.

Other matters of cost allocation provoke disagreement between the State Board and the NCCPBE. Specifically, the NCCPBE has requested that provisions of the Delaware Budget Act requiring local districts to pay any increases in employees' fringe benefits after 1976 be disregarded for the forthcoming year. This proposal would result in the State assuming these entire costs for fiscal year 1978. The State Board objects to this proposal on grounds that such an exemption unduly favors Northern New Castle County over other districts within the State.

Finally, defendant State Board and the NCCPBE diverge on the issue of payment for ancillary relief, the State Board protesting the assessment of any remedial relief costs against the State.

The complexity of reorganizing into a single district and thereafter managing the unitary district in a fiscally sound manner necessitates some adjustment in the traditional allocation of financial responsibility. In 1976–77, the State contributed to the public schools in the desegregation area [199] $68,576,393 for current operating expenditures plus an unknown amount in other categories. During the transition period, in addition to shouldering its share of desegregation expenses, the State will be expected to continue to maintain a level of support to the desegregation area commensurate with its past funding practice. That level will be

---

**198.** 416 F.Supp. at 359.

**199.** In addition to the $68,576,393, which includes salaries, operating expenses, and equalization funds, the state either pays in full or contributes to the following categories: minor capital improvements, major capital improvements, maintenance, transportation, non-public school transportation, voluntary transfer transportation, service to school district funds, educational contingency fund. Doc. 691.

measured by the entire dollar support for the 1976–77 fiscal year or the current 1977–78 year, whichever is higher.[200] So that all concerned can make an accurate assessment of State and local financial support for public education in the desegregation area, defendant Department of Public Instruction will be required to file by August 15, 1978 a comprehensive report detailing state contribution to education in the desegregation area in all categories for the current fiscal year and the 1976–77 fiscal year. Similarly, by the same date the NCCPBE will be required to file detailed financial information for the current fiscal year similar to that provided for the prior five years in NCCPBE Exh. 19.

█ The transition to a racially nondiscriminatory unitary school system entails increased costs,[201] notably in the area of ancillary relief. Joint funding of public education by state and local authorities is best accomplished under a cost allocation scheme that places responsibility with the local districts for normal operating expenses but which charges the bulk of transitional desegregation costs to the State for a limited period of time and on a declining scale. Initially, the NCCPBE, fortified by a dollar amount at least equal to the level of State support of the past or current year, whichever is higher,[202] is responsible for the salaries and the fringe benefits of the current staff and for any increases granted for the forthcoming year. To assess these costs directly against the State would result in gratuitously burdening taxpayers who reside outside the desegregation area and resulting favoritism toward the desegregation area. Consequently, no exemption is created to the Delaware Budget Act § 77(c). Second, the NCCPBE is also charged with paying its own operating costs after June 30, 1978.[203]

A number of other costs arise out of the order to desegregate and probably would not be incurred otherwise. In-service training, remedial education, and a counselling and guidance program are critical to effective desegregation. In recognition of that fact, the President of the NCCPBE has proposed that much of the last two weeks of the current school year be devoted largely to orientation and in-service training programs.[204] Among the virtues of this idea is cost efficiency, obtained because the essential staff are already on hand and on district payrolls. Accordingly, the New Board is authorized to schedule such training and orientation and to so notify the eleven districts; the course and direction of such orientation and in-service training will be the responsibility of the New Board. Expenses other than covered salary costs of personnel under contract to the individual districts for in-service training and orientation prior to June 30, 1978 shall be paid by the State. Should in-service training be required in excess of the two week period, subsequent to June 30, 1978 all salary costs will be shared equally between the single district and State defendants, with the exception of covered salaries paid under individual con-

**200.** The State level of support has been increasing although student enrollment has been declining. *See* Chart 1.

**201.** Reorganization also has the potential to generate savings. Economies of scale and a decrease in the number of administrators required to operate the school system provide two such possible cost benefits. Whether these savings are in fact realized will be determined by the NCCPBE.

**202.** Fixing the minimum State level of support in terms of absolute dollars enables the State to escape the financial burden of inflation. A fixed rate also ignores the steadily upward trend of absolute dollar support by the State. The State must, however, treat the single district the same as all other districts and the specified level of support is a minimum which can be increased at the discretion of the State defendants.

**203.** Pursuant to Court order, the individual districts and the State Board will support financially the NCCPBE through June 30, 1978. Doc. 530.

**204.** Doc. 66 30, at 23–25 (Scarborough).

tracts which shall be assumed by the NCCPBE.

In assessing costs against the State, the Court is aware that from the outset of this case the State Board of Education has claimed not to be a proper party to this action. But the three-judge court held "that to the extent that any schools in the state are in violation of *Brown* . . . the State Board must bear primary responsibility." 379 F.Supp. at 1222. The three-judge court further delineated the State Board's duty under *Brown* as requiring that it "effectuate a transition to a racially nondiscriminatory school system" and "eliminate from the public schools 'all vestiges of state-imposed segregation.'" *Id.* State action surrounding passage of the Educational Advancement Act in 1968 effectively stymied the mandate of *Brown II* by excluding Wilmington from any reorganization scheme. Further, after a ruling that the Educational Advancement Act was unconstitutional, the State Board was ordered to devise an effective scheme to eliminate the dual school system. No responsive plan was forthcoming. Having failed over time to fulfill its constitutional obligation to provide a nondiscriminatory system of education for the children of this state, the State must now share the cost necessary to remedy the wrongs it perpetuated.

It is well settled that a state may be assessed for the costs of ancillary relief. *Milliken II, supra.* Despite a direct impact on a state treasury, a state may be ordered to make prospective payments to come into compliance with federal law. *See Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).[205] The essence of *Mil-liken II* is that costs should be allocated between state and local officials in an equitable fashion, without overburdening either source. Because the tax rate to be set for the single district represents a substantial increase to most real property owners within the desegregation area, the Court deems it both impractical and inappropriate to assess any additional local costs at this time. Instead, mindful of the State's objection to continually paying for open-ended ancillary relief initiated by the NCCPBE, the Court has made an effort to balance competing state and local interests in a manner fairly and practically distributing the costs of desegregation.[206]

In the first year of desegregation, 1978–79, the salaries and fringe benefits of personnel hired by the NCCPBE or its successor as human relations specialists, counsellors, and teachers for remedial and compensatory education necessitated by desegregation, as determined by the NCCPBE or its successor, will be entirely funded by the State defendants. As these positions are mandated by the desegregation decree and do not arise out of the normal operation of the schools, relevant provisions of the Budget Act shall not be deemed applicable until the opening of school for the 1979–80 school year. During the 1978–79 school year, remedial and compensatory education programs as established by the NCCPBE will also be fully financed by the State as a cost of desegregation. During the second year of implementation, the above costs will be shared equally by the State and the single district, and the Budget Act shall be deemed applicable to employees hired as a result of or diverted to desegregation work. In successive years, the State's contribution

---

**205.** In the instant case, the State Treasurer, who controls the physical disbursements of funds, was added as a party defendant after the State temporarily delayed payment of court ordered expenses. Subsequently, a motion to dismiss the State Treasurer was filed. Although full cooperation is expected in the future, the motion to dismiss is considered premature at this time and is thus denied.

**206.** A figure of 5% was added to the per pupil expenditure in arriving at the maximum tax rate that the New Board is empowered to set. This figure is only one-half that recommended by the State, Doc. 693, and is recognized as being inadequate to cover the costs of desegregation unless the allocation of costs set forth here is followed. students are excepted. *See* Doc. 691, at 3.

to desegregation costs incurred by the New Board each fiscal year will decline 10% per year until the 1985 fiscal year, whence its obligation for payment of any desegregation expenses will cease.

During this transition period, if for some unforeseen reason the State's level of dollar support drops below that of fiscal year 1976–77 or the current fiscal year, whichever is higher, the above schedule shall be modified and the difference assessed against the State defendants to assist the New Board in meeting the costs of ancillary relief.

As is currently the practice, and in accordance with State law, the State will be obligated to meet 100% of the cost of student transportation, plus all costs of additional extracurricular activity buses necessitated by desegregation.[207]

Finally, although all efforts should be made to secure available federal funds, the prospect of such income is not intended either to alter the mandated cost allocation or to reduce the level of State support.

## IV. *FUTURE STATUS OF THIS LITIGATION*

### A. *Continuing Jurisdiction*

■ This Court will retain supervisory jurisdiction in accordance with *Evans v. Buchanan*, 281 F.2d 385, 391 n. 1 (3d Cir. 1960), until the transition to a unitary school system is completely effectuated and the system is demonstrably operational over time. At that point, any party may move that this Court terminate its jurisdiction.

### B. *Survival of Component School Districts Pending Exhaustion of All Appeals*

The component districts have requested that even after transfer of full authority to the NCCPBE, they all be kept in existence for the limited purpose of pursuing rights of appeal or judicial review. That the districts in some form should have the opportunity to pursue or respond to such appeals or judicial review is unquestioned. The problem with granting the precise request, however, is that the NCCPBE would be responsible for the costs, fees, and charges incurred in connection with such appellate review proceedings.

■ Imposing upon the New Board the costs for eleven component districts is difficult because the nine predominantly white districts are in almost perfect, and perhaps perfect, alignment with respect to litigation stances. Further, until one reaches the question who pays for what costs, and perhaps even then, the predominantly white districts are in precise alignment with defendants State Board of Education and State Treasurer. Under this circumstance, and taking into account that already burdened real property taxpayers are the sole source of local income for the NCCPBE, the Court cannot justify saddling the NCCPBE with nine attorneys' fees to espouse the same position. Accordingly, the NCCPBE will be authorized to pay only the costs, fees, and charges of one counsel from the nine predominantly white districts who pursue an appeal or further judicial review. Because plaintiffs espouse an aligned position different from that of the nine predominantly white districts, the NCCPBE will also be authorized to pay the costs, fees, and charges of one counsel representing plaintiff, intervening plaintiff, and the NCCPBE minority member. Similarly, because the DeLaWarr District has maintained a different posture from all other parties throughout these proceedings, if it should choose to pursue appellate relief, its costs, fees and charges should be borne by the NCCPBE. Finally, although remaining in existence and therefore probably not in need of court authorization, the New Board

---

**207.** Transportation expenses for handicapped students are excepted. *See* Doc. 691, at 3.

is authorized to pay its own costs, fees, and charges in the event it determines to pursue and/or defend any position during appellate proceedings.

All costs, fees, charges, services, and obligations incurred prior to the full transfer of authority to the NCCPBE shall be borne by the respective districts and shall not become the obligation of the New Board. It is hoped the parties will cooperatively expedite all appeals and efforts to obtain judicial review so that all districts which choose to seek further appellate review can continue to have counsel of their own choice paid from their respective district coffers.

### C. *Successor to the NCCPBE*

As of July 1, 1978, the NCCPBE shall become the New Castle County Board of Education ("NCCBE"). Hopefully, by that time the basic desegregation planning will have been accomplished and the NCCBE will be functioning as the operational school board of the unitary district.

### *CONCLUSION*

It was noted early in this Opinion that a state court predecessor to the instant litigation was part and parcel of the landmark *Brown v. Board of Education* suit. At this point, the Court regards it worthwhile briefly to revisit the decision in *Brown II, supra.* In that case, the Supreme Court cited the "proximity to local conditions" of lower courts as a justification for remand. 349 U.S. at 299, 75 S.Ct. 753. Those lower courts were told to be guided by "equitable principles" and instructed that "equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs". *Id.* at 300, 75 S.Ct. at 756 (footnotes omitted). The Supreme Court emphasized "the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them", *id.,* and empowered the lower courts to "consider problems related to administra-

tion, arising from the physical condition of the school plant, the school transportation system, personnel, revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools on a nonracial basis, and revision of local laws and regulations which may be necessary in solving the foregoing problems." *Id.* at 300–01, 75 S.Ct. at 756. Finally, the lower courts were directed to evaluate "the adequacy of any plans the defendants may propose to meet these problems and to effectuate a transition to a racially nondiscriminatory school system." *Id.* at 301, 75 S.Ct. at 756.

Over twenty-three years have elapsed since *Brown II* and the goal of nondiscriminatory public education in the desegregation area has not reached fruition. All the foregoing problems articulated by the Supreme Court, and more, have been at issue in this enduring litigation. The Court has looked for guidance to each of the equitable considerations enumerated by the Supreme Court, devoting particular attention to local needs and the importance of reconciling public and private interests. Now the promise of *Brown* is in sight; implementation is near and the constitutional infirmity that to children may "affect their hearts and minds in a way unlikely ever to be undone", *Brown I,* 347 U.S. at 494, 74 S.Ct. at 691, will at last receive treatment. Schools and this riven community may devote their full attention to education rather than litigation.

Although the secondary remedial issues addressed in this Opinion are relatively few and narrow, they have been explored at length because their significance merits a full explication of the exercise of this Court's equitable power made necessary by a statutory void created by a longstanding legislative default. This Opinion shall constitute the findings of fact and conclusions of law of the Court pursuant to F.R.Civ.P. 52.